## PEOPLE v DUNBAR

Docket No. 67726. Argued June 6, 1985 (Calendar No. 29).—Decided November 19, 1985. Rehearing denied 424 Mich 1201.

Jeffrey Dunbar, a juvenile, was convicted by a jury in the Recorder's Court of Detroit, Robert P. Van Wiemeersch, J., of first-degree murder, after the juvenile division of the Wayne Probate Court, James E. Lacey, J., waived jurisdiction. The Wayne Circuit Court, John M. Wise, J., affirmed the waiver after the defendant's trial and sentencing. The Court of Appeals, Bronson, P.J., and D. E. Holbrook, Jr., and Ransom, JJ., affirmed in an unpublished opinion per curiam (Docket No. 43182). The defendant appeals.

In an opinion by Justice Cavanagh, joined by Chief Justice Williams and Justices Levin and Brickley, the Supreme Court *held:*

1. Jurisdiction of the defendant should not have been waived by the probate court. A review of the waiver hearing record leaves the definite and firm conviction that, aside from the seriousness of the offense charged, the defendant was tried as an adult because the court believed that the adult correctional facilities provided better vocational training than the juvenile facilities. The record also indicates that the defendant would have been amenable to the treatment available in the juvenile facilities, did not pose a danger to the public, and would not have disrupted the rehabilitation of other juveniles.

2. An order by the juvenile division of a probate court waiving jurisdiction of a juvenile will be affirmed where the probate court, on the basis of substantial evidence and thorough investigation, determines that the juvenile is not amenable to treatment or that, despite potential for treatment, the nature of the difficulty is likely to render the juvenile danger-

REFERENCES FOR POINTS IN HEADNOTES
[1-3] Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children §§ 16-21.
   Possibility of rehabilitation as affecting whether juvenile offender should be tried as adult. 22 ALR4th 1162.
[3] Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children §§ 60-62.

ous to the public if released at age nineteen or to disrupt the rehabilitation of other juveniles in the treatment program prior to release. In addition, there must be evidence on the record, to which the probate court refers, regarding the relative suitability of programs available in the juvenile and adult correctional systems.

Reversed.

Justice BOYLE, joined by Justices RYAN and RILEY, dissenting, stated that the probate court correctly waived jurisdiction. The court's findings were based on substantial evidence regarding the seriousness of the offense, the personality and needs of the defendant, and the relative suitability of juvenile and adult programs and facilities, and the court considered as well the interests of the public welfare and the protection of the public security.

1. In reviewing a waiver of jurisdiction by the juvenile division of a probate court over a juvenile offender, the interests of both the juvenile and society must be considered. In making the determination, the court shall consider and make findings on: the child's prior record, character, physical and mental maturity, and pattern of living; the seriousness of the offense; whether the offense, if minor, is part of a repetitive pattern of offenses which would lead to a conclusion that the child may be beyond rehabilitation under regular statutory juvenile procedures; the relative suitability of programs and facilities available to the juvenile court and the criminal court for the treatment of the child; and whether the best interests of the public welfare and the protection of the public security, generally, require that the child stand trial as an adult offender.

2. An order waiving jurisdiction should be affirmed where the probate court has found, on the basis of substantial evidence and thorough investigation, either that the juvenile is not amenable to treatment or that despite a potential for treatment the nature of the difficulty is likely to render the juvenile dangerous to the public, if released at the age when juvenile jurisdiction ceases, or disruptive of the rehabilitation of other juveniles prior to release. The seriousness of the offense alone should not be used to determine the likelihood that a juvenile, potentially amenable to treatment, will endanger the public or other children. Likewise, the minor's amenability to treatment is a significant, but not paramount, factor. Rather, all of the waiver criteria must be considered. In this case the probate court considered all of the relevant criteria and based its findings on substantial evidence. Review of the court's findings

of fact and the evidence presented mandates the conclusion that the court's decision waiving jurisdiction was correct. The defendant was a principal actor in a brutal robbery-murder. The record graphically demonstrated the gravity of the offense and the extent of the danger the defendant presented to the public. Witnesses testified that the defendant was physically and mentally mature, that his crime was not the result of immaturity, and that the defendant possessed a manipulative personality rendering it unlikely that treatment as a juvenile would be effective.

3. Appellate review of a waiver of a juvenile should not be de novo. In this case, however, the majority has substituted its judgment for that of the probate court and has invalidated a waiver decision that it admits is supported by the record. As a result, the defendant, who was properly waived and who was found guilty beyond a reasonable doubt of first-degree murder will be discharged. The fact that, in the retrospective view of the majority, the defendant had promise cannot justify the substitution of the Supreme Court's judgment for that of the probate court.

### Opinion of the Court

1. Courts — Juvenile Courts — Infants — Waiver of Jurisdiction.

Before waiving jurisdiction of a juvenile to a criminal court, the juvenile division of a probate court must determine, on the basis of substantial evidence and thorough investigation, that the juvenile is not amenable to treatment or that, despite potential for treatment, the nature of the difficulty is likely to render the juvenile dangerous to the public if released at age nineteen or to disrupt the rehabilitation of other juveniles in the treatment program prior to release; in addition, the court must consider and refer on the record to evidence regarding the relative suitability of programs available in the juvenile and adult correctional systems.

### Dissenting Opinion by Boyle, J.

2. Infants — Criminal Law — Juvenile Courts — Waiver of Jurisdiction.

*In making a determination whether jurisdiction of a juvenile should be waived to a criminal court, the juvenile division of a probate court should consider and make findings on: the child's prior record, character, physical and mental maturity, and pattern of living; the seriousness of the offense; whether the offense, if minor, is part of a repetitive pattern of offenses*

*which would lead to a conclusion that the child may be beyond rehabilitation under regular statutory juvenile procedures; the relative suitability of programs and facilities available to the juvenile court and the criminal court for the treatment of the child; and whether the best interests of the public welfare and the protection of the public security, generally, require that the child stand trial as an adult offender (MCL 712A.4; MSA 27.3178[598.4]; MCR 5.911[A][2]).*

3. INFANTS — CRIMINAL LAW — JUVENILE COURTS — WAIVER OF JURISDICTION — APPEAL.

*An order of the juvenile division of a probate court waiving jurisdiction of a juvenile to a criminal court should not be reviewed de novo, but should be affirmed where it is determined that the probate court has found, on the basis of substantial evidence and thorough investigation, either that the juvenile is not amenable to treatment or that despite a potential for treatment the nature of the difficulty is likely to render the juvenile dangerous to the public, if released at the age when juvenile jurisdiction ceases, or disruptive of the rehabilitation of other juveniles prior to release.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman*, Deputy Chief, Civil and Appeals, and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people.

*Alvin C. Sallen (Thomas M. Harp,* Juvenile Defender's Office, of counsel) for the defendant.

CAVANAGH, J. This case requires us to determine the appropriate standard for reviewing an order, entered by the juvenile division of a probate court, waiving jurisdiction over a juvenile defendant so that the juvenile can be tried as an adult offender. We must also determine whether defendant was properly waived.

We adopt the standard of review articulated in *People v Schumacher,* 75 Mich App 505; 256 NW2d 39 (1977). Under this standard, we conclude that defendant should not have been waived from

the juvenile division of Wayne Probate Court to Detroit Recorder's Court. Our review of the waiver hearing leaves us with the definite and firm conviction that, aside from the seriousness of the offense charged, defendant was tried as an adult because the probate court believed that adult correctional facilities provided better vocational training than juvenile facilities. Jurisdiction should not have been waived because defendant would have been amenable to the treatment available in juvenile facilities, he did not pose a danger to the public, and he would not have disrupted the rehabilitation of other juveniles. This sixteen-year-old defendant was thus made to stand trial for an offense punishable by a mandatory sentence of imprisonment for life without parole—a sentence which could (and ultimately did) render the promise of better educational facilities in the adult system entirely illusory.

I

Defendant was one of several individuals who participated in the theft of the decedent's bicycle. One struck the decedent with a car jack, another administered fatal knife wounds.[1] Defendant struck the decedent with a chain that had evidently been used by the decedent to lock his bike. Defendant was charged with first-degree felony murder and armed robbery. Since defendant was sixteen years old when the offense occurred, he could not be tried as an adult until the juvenile division of probate court waived its jurisdiction over him. MCL 712A.4; MSA 27.3178(598.4). The

[1] The adult codefendant who stabbed decedent pled guilty to second-degree murder and was sentenced to ten to twenty-five years in prison. The juvenile codefendant who wielded the car jack was waived to Recorder's Court, convicted of first-degree felony murder, and sentenced to a mandatory nonparolable life term.

prosecutor requested that jurisdiction be waived to Recorder's Court. The parties stipulated that a felony had been committed and that there was probable cause to believe that defendant had committed it. Numerous witnesses testified concerning the appropriateness of waiver, but only one witness recommended that defendant be waived. The probate court waived jurisdiction.[2]

Defendant was subsequently convicted of felony murder and received a mandatory nonparolable life sentence. Defendant appealed the waiver order to circuit court, which affirmed several months after the trial and sentencing. The Court of Appeals, in an unpublished decision, affirmed both the waiver order and defendant's conviction. We granted defendant's application for leave to appeal. 419 Mich 855 (1984).

## II

MCL 712A.4(4); MSA 27.3178(598.4)(4) sets forth five criteria which the probate court must consider in determining whether jurisdiction should be waived:

> Upon a showing of probable cause, the court shall conduct a hearing to determine whether or not the interests of the child and the public would be served best by granting a waiver of jurisdiction to the criminal court. In making the determination, the court shall consider the following criteria:
> (a) The prior record and character of the child, his physical and mental maturity and his pattern of living.

---

[2] The decision to waive jurisdiction consists of two phases: 1) a determination that a felony has been committed and that there is probable cause to believe that the juvenile committed the crime; and 2) a determination that the interests of the juvenile and the public would best be served by waiving jurisdiction. MCR 5.911(A)(1). See also former JCR 1969, 11.1.

(b) The seriousness of the offense.

(c) Whether the offense, even if less serious, is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under existing juvenile programs and statutory procedures.

(d) The relative suitability of programs and facilities available to the juvenile and criminal courts for the child.

(e) Whether it is in the best interests of the public welfare and the protection of the public security that the child stand trial as an adult offender.

MCR 5.911(A)(2), formerly JCR 1969, 11.1(B), is substantially identical.[3]

The Juvenile Code must be liberally construed in order to provide each child coming within the juvenile division's jurisdiction with such care, guidance, and control as will be conducive to the child's welfare and the state's best interest. Proceedings under the Juvenile Code are not criminal in nature. MCL 712A.1; MSA 27.3178(598.1).

Although this Court has never articulated a standard for reviewing waiver decisions, Justice RILEY, in *People v Schumacher, supra,* has done so. We believe that Justice RILEY has aptly and thor-

[3] MCR 5.911(A)(2) provides:

"In making the determination, the court shall consider and make findings on the following criteria before a waiver is granted:

"(a) the child's prior record and character, physical and mental maturity, and pattern of living;

"(b) the seriousness of the offense;

"(c) even though less serious, if the offense is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under the regular statutory juvenile procedures;

"(d) the relative suitability of programs and facilities available to the juvenile and criminal courts for the child;

"(e) whether the best interests of the public welfare and the protection of the public security, generally, require that the child stand trial as an adult offender."

oughly described the relevant considerations and standard of review:

> Although our statute and court rule do not speak in terms of "amenability," we discern within them an intention that the juvenile's prospects for rehabilitation be seriously considered. Otherwise, our duty of liberal construction, aimed at providing care, guidance and control similar to that provided by the child's parents, would have little meaning in the instant setting. Similarly, the mandate that the probate court consider whether the child's and the public's interest are *best* served by waiver would truly be hollow if rehabilitative potential were not seriously weighed.
>
> On the other hand, we would be blind indeed were we to overlook the clear solicitude expressed by court rule and statute concerning the public security and welfare. See JCR 11.1(B)(5) and MCL 712A.4(4)(e); MSA 27.3178(598.4)(4)(e).
>
> Accordingly, we hold that an order waiving jurisdiction will be affirmed whenever the judge's findings, based upon substantial evidence and upon thorough investigation, show either that the juvenile is not amenable to treatment, or, that despite his potential for treatment, "the nature of his difficulty is likely to render him dangerous to the public, if released at age [nineteen],[4] or to disrupt the rehabilitation of other children in the program prior to his release." *People v Fields (On Rehearing),* 391 Mich 206, 242, n 13; 216 NW2d 51 (1974) (LEVIN, J., *dissenting*), quoting *State v Gibbs,* [94 Idaho 908, 916; 500 P2d 209 (1972)].
>
> We believe this holding hews a close line between the often competing interests of the juvenile and society. We emphasize, however, that the "seriousness of the offense," MCL 712A.4(4)(b); MSA 27.3178(598.4)(4)(b), JCR 1969, 11.1(B)(2), may not alone be used to determine the likelihood that

---

[4] The jurisdiction of the juvenile division of a probate court ends when the youth becomes nineteen years old. At that time, the youth must be discharged from a correctional institution. MCL 712A.2, 712A.2a, 712A.5; MSA 27.3178(598.2), 27.3178(598.2a), 27.3178(598.5).

> a potentially amenable juvenile will endanger the
> public or other children in a rehabilitation pro-
> gram. [Citations omitted.] The Legislature and the
> Supreme Court have indicated by statute and rule,
> respectively, that all of the waiver criteria shall be
> considered; thus, no reason appears why the "seri-
> ousness of the offense" should gain preeminence
> over other factors to be assessed. [75 Mich App
> 511-512.]

Justice RILEY further stated, and we agree, that
there must be evidence on the record, to which the
probate court must refer, regarding the relative
suitability of programs and facilities available in
the juvenile and adult correctional systems. *Id.,* p
514.

### III

In the instant case, it was undisputed that de-
fendant had no prior criminal record. Even though
he lived in a very "tough" neighborhood, he had
never been affiliated with any street gang. Defen-
dant dropped out of school about a year before the
offense was committed because he had been beaten
several times by gang members. Defendant wanted
to be an auto mechanic, but could read only at a
fourth-grade level. The expert witnesses agreed
that defendant had to be able to read at a sixth-
grade level before he could successfully participate
in vocational training. They also agreed that only
adult correctional facilities provided adequate auto
mechanic programs.

Michael McMillan, a clinical psychologist from
the Wayne County Clinic for Child Study, testified
that he gave numerous psychological and aptitude
tests to defendant. He originally recommended in
a written report that defendant be waived because
"his personality and problems are not the type

which are adequately dealt with on the juvenile level." McMillan believed that defendant was mature but was also self-centered, greatly desired to be recognized by others, lacked sensitivity, and was manipulative. However, with proper direction, McMillan believed that these traits could be used in a socially desirable manner. He did not believe that "positive peer culture," the primary psychological technique used in juvenile facilities, would be very effective. Nevertheless, he did not see defendant as an intrinsically hostile or dangerous child or a murderer. He believed that defendant knew the difference between right and wrong.

McMillan changed his recommendation one day after he wrote his report because a supplemental reading test indicated that defendant was functioning at a fourth-grade level rather than a second-grade level. He now believed that a juvenile training school could improve defendant's reading level to a functional point during the relatively short time defendant would be at the school. He concluded that the only benefit defendant could receive in the adult system would be vocational training. McMillan described this as the most difficult case he had ever encountered.

Barbara Dicks, a psychiatric social worker for the Wayne County Juvenile Court, concurred in McMillan's original recommendation solely because of the seriousness of the offense. However, she also changed her recommendation after viewing defendant's improved reading results. She thought that positive peer culture could help defendant and did not view his personality as extreme. If comparable vocational education were available in juvenile facilities, she believed that defendant would be better off there. She also concluded that the waiver decision was close.

Frank Gregurek, Jr., a probation officer for the

Wayne County Juvenile Court, was the only person to recommend waiver. He viewed defendant as a friendly and open person, saw no evidence of manipulativeness, and thought that positive peer culture would help defendant. He based his recommendation on the seriousness of the crime and the availability of vocational training in the adult system. If such training were available in juvenile facilities, he would not have recommended waiver.

Will Wilson, an administrator of delinquency programs for the Wayne County Department of Youth Services, explained that juvenile correctional facilities provided limited prevocational services. He recommended that defendant be placed in the juvenile system, notwithstanding the seriousness of the offense, because defendant had no history of truancy or violent behavior. Wilson believed that positive peer culture techniques were more effective with first offenders regardless of the seriousness of the offense.

Ex Rhodes Barham, an employee at the reception center of Jackson prison, testified that educational, psychological, and vocational services were available at all state adult correctional facilities. Barham offered no recommendation concerning waiver.

Defendant presented four witnesses. A teacher who had known defendant in 1973 and 1974 testified that defendant was an excellent student with good potential who had caused no problems. A neighbor who had known defendant for over seven years stated that defendant was not dangerous. Defendant's social studies teacher at the Wayne County Youth Home described defendant as well-adjusted, eager, ambitious, and dependable. A minister testified as to defendant's good character.

The probate judge considered and made findings of fact on each of the five waiver criteria. As to the

first criteria, the judge concluded that defendant had no prior criminal record, was physically mature, and had an acceptable pattern of living.[5] The seriousness of the offense weighed in favor of waiver.[6] As to the third criteria, the judge concluded that defendant did not have a repetitive pattern of offenses and was amenable to rehabilitation in the juvenile system.[7]

The judge made the following findings on the fourth and fifth criteria:

Now, the Court has considered the forth [sic] criteria, the relative suitability of the programs and facilities available to the juvenile and criminal courts for the child. From the testimony, the

[5] "As to the first criteria, the Court finds from the testimony that the respondent has no adjudicative Juvenile Court record, and from the testimony that he's physically mature, from the testimony that his pattern of living is acceptable under the particular situation where he lives. And that situation is found to be from the testimony, a high crime area and one in which several gangs inhabit. The Court finds that the absence of the respondent from school for one year may be because of the beating administered to him because of his brother but the Court is not convinced that the staying out of school is the best possible decision and resolution to that possible reason for staying out of school.

"The Court in criteria one has considered the testimony of the defense's presented witnesses. Mr. Andrews, the fifth and sixth grade school teacher who testified that while in the fifth or sixth grade that the respondent did well in school and presented no particular problem, if any, to the school people. The same pattern has been existent as is testified by Mr. Martin in the Youth Home since his stay there on July 26, 1978, and that he has been no problem there. And the testimony of the Reverend Mitchell indicates that the family itself is a good family."

[6] "The seriousness of the offense is the next criteria; the stipulation with the court with the allegations in the petition. The Court does find without equivocation that the taking of a human life is a serious crime. That that human being has every right to live as much as Jeffrey has a right to live, and he no longer can exercise that right. So without belaboring that point, the Court finds from the petition that the offense is the most serious in our penal code; that it is not a less serious offense . . . ."

[7] ". . . Jeffrey does not have a repetitive pattern of offenses that would lead this Court to determine that he is beyond rehabilitation under the regular statutory juvenile procedures."

Court determines that part of the needs of the respondent here are educational and vocational. That he's reading at a 4.5 grade level and the Court determines that this has to be brought up in order to function at least to perhaps a 6.0 grade level or a 6.5 grade level, and hopefully right up to an eigth [sic] grade level. That in order to function in any other area there are certain basic skills which the reading level is an indicia; that these skills are lacking and that in order to gain these skills that really must be brought up. He has done well earlier in school in math as was testimony in the record which demonstrates to this Court that there's a potential for him to improve himself to become a functioning citizen.

He has expressed a desire as has been testified here to become a mechanic. The educational facilities at the adult and at the juvenile levels has [sic] been weighed. At the juvenile level there is a reading program there and there's a preliminary vocational program there. The familiarity as was testified to the average length of stay is eight months. That in the adult level there's a full vocational program and there's an additional program that runs at least through the high school. And that the length of stay, of course, would be determined by sentence in the adult court if he were convicted and his ultimate placement would in part be determined by the length of time that he would spend there.

The Court has considered the criteria where it is found to be in the best interests of the public welfare and for the protection of the public security, generally, that said juvenile be required to stand trial as an adult offender. The Court in its investigation of the interests of the child and the public has determined that Jeffrey needs an educational backing that is lacking in the juvenile system. It is going to take more time than the juvenile system can afford him to bring his reading skills up and other skills. And he certainly hasn't helped himself educationally by remaining out of school for the past one year and this unfortunately works to Jeffrey's detriment. In his best interests,

he has to bring that educational level up and that in the best interests of the public that he has to bring that level up.

As to vocational matter, I think that the Court feels that the adult system, as the testimony shows, is far superior to the juvenile facilities and that he would better be able to function in a free society after gaining educational and vocational training. And that the interests of the public welfare and the protection of the public security indicate that Jeffrey is not of such a position at this time to function adequately in society. That he needs something that must be given to him in a more structured setting than he receives at home.

Therefore, it is the Court's decision that the Motion requesting Waiver of Jurisdiction on Jeffrey Dunbar to the adult court be granted . . . .

The probate judge thus made adverse findings on the second, fourth, and fifth waiver criteria. The adverse finding on the second factor—the seriousness of the charged offense—could not alone have justified a waiver of jurisdiction. As to the fourth factor, the judge did not find that defendant would not have benefited from juvenile programs and facilities. The judge only concluded that defendant would be unable to increase his reading level significantly during the relatively short time he would be in the juvenile system. In addition, defendant would not be able to learn a trade because the juvenile facilities did not offer vocational training. As to the fifth factor, defendant was not found to be a dangerous or disruptive person. The court merely found that without sufficient remedial reading and vocational training, defendant would not be able to make an honest living if released at age nineteen and would probably resort to criminal activity. The adverse finding on the fifth criteria was based solely on the adverse finding on the fourth criteria.

Other jurisdictions have held that a waiver of jurisdiction to an adult court is improper where a finding of lack of amenability to treatment or danger to the public is based upon the correctional facility's failure to provide adequate treatment and programs. In *In re Welfare of JEC v State,* 302 Minn 387; 225 NW2d 245 (1975), the defendant was waived to an adult court because there was no juvenile program specifically designed for "hardcore, sophisticated, aggressive delinquents . . . ." Such a program had existed, but was terminated for lack of funding. The crucial question was whether the juvenile court could waive jurisdiction because there was no program which could rehabilitate the defendant, with adequate protection for the public, by the time defendant became twenty-one. The Minnesota Supreme Court, after noting that the defendant had a statutory right to rehabilitative treatment, held that the juvenile system's failure to provide adequate treatment facilities could not be the basis of a finding that a juvenile is not amenable to treatment or is dangerous to the public. *Id.,* 389. The case was remanded to the juvenile court to determine whether any program existed or could be created to treat the defendant in the juvenile system. See also *In re Patterson,* 210 Kan 245, 251-252; 499 P2d 1131 (1972).

In *United States v Tillman,* 374 F Supp 215 (D DC, 1974), the defendant was convicted of first-degree felony murder when he was nineteen years old and was sentenced to life imprisonment. Although the defendant was eligible for treatment under the Federal Youth Corrections Act (YCA), this disposition was not recommended. Two of the reasons given were the defendant's need for long-term psychotherapy, which could not be completed during his stay at the youth center, and his inabil-

ity to achieve significant academic or vocational gains while at the center due to his low intelligence. The district court rejected both reasons:

> The Federal Youth Corrections Act, 18 USC § 5010(c), expressly provides for long term treatment for youth offenders. . . . [T]he conclusion . . . that the defendant could make rehabilitative progress from involvement in long term psychotherapy would appear to support a finding that the defendant would benefit from YCA treatment. Certainly a recommendation against a YCA commitment because of the lack of long term psychotherapy treatment facilities is improper . . . . [T]here is no legal authority to deny an eligible offender a Youth Act sentence because of the inability of the correctional institutions to provide treatment contemplated by the Act. If the Lorton Youth Centers cannot, as a practical matter, accommodate offenders with long term treatment needs, there appears to be no legal obstacle to prevent cooperation in this regard between Lorton and the Federal Bureau of Prisons, which does have long term treatment programs. . . .
>
> *     *     *
>
> [T]he defendant's inability to achieve educational or vocational gains does not necessarily mean that he would not benefit from YCA treatment. . . . The 5010(e) reports did not address the question of whether or to what extent the defendant needed academic and vocational treatment. Instead they simply concluded that he would not fit into the established programs at the Youth Center, regardless of whether those programs provided the spectrum of treatment services contemplated by the YCA or needed by the defendant. . . .
>
> Addressing solely the question of whether the defendant's low intelligence level would "hamper his making any significant progress in a school and/or vocational program" at the Youth Center, the evidence on the record does not support the Classification Committee's position and some of it

tends to show that the defendant would make academic, vocational and rehabilitative progress from participating in the programs. . . . [T]he 5010(e) reports did not explain why a person of the defendant's intelligence level could not make progress in the Center's basic reading and mathematics programs. . . . The defendant's reading level presently qualifies him for some of the vocational programs at the Youth Center, and it is the policy of the Center to offer part or full time reading and training programs to persons whose reading is deficient until they are able to meet the entry qualifications. . . .

Thus the defendant does appear to have some rehabilitative potential in the academic and vocational areas, and whatever this potential is, it has not been shown why it would adversely affect the defendant's ability to benefit from rehabilitative treatment under the YCA. [*Id.*, 223-224.]

Here, only one witness favored a waiver and his opinion was based upon the prospects for vocational training in the adult system. The defendant was a first offender and the record clearly demonstrates that he was a good prospect for rehabilitation. The probate judge found that defendant could be rehabilitated in the juvenile system and could benefit from the available educational services. Reduced to its simplest terms, the judgment of the probate court was that this sixteen-year-old individual should be tried for a nonparolable capital offense in order that he have the benefit of the slightly better vocational programs thought to be available in the adult system. With this judgment, we disagree.

Society must be protected from dangerous individuals, but the Legislature intended that the long-term protection for society is to come from the successful rehabilitation of the juvenile. Where the prospects for a juvenile's rehabilitation are so

slim that society's protection requires a waiver, waiver must be ordered. Here, the probate judge believed that rehabilitation was possible and attempted to place the defendant in a setting that would provide the best vocational training program. This attempt was pointless, however, since the judicial system gave vocational training with one hand while taking away with the other hand any possibility that the vocational training would ever be used. This defendant has been sentenced to live in prison until he dies. Of what use is his vocational training?

The Department of Social Services is required to meet the educational and treatment needs of youths residing in juvenile correctional facilities. MCL 803.303; MSA 25.399(53). Defendant should not be penalized for the state's failure to provide adequate vocational training or for his desire to learn a skilled trade. It is ironic that if defendant had committed this crime at a younger age, the probate judge might have concluded that confinement to a juvenile facility would be long enough to increase his reading level sufficiently.

We recognize that it is rare for this Court to intervene in a matter of this kind. However, unless the rule is to be that such decisions are not reviewable at all, we must intervene on these facts. There is ample evidence that defendant was not incorrigible, was amenable to rehabilitative programs, and had promise.

IV

The difficulty of crafting a remedy for this defendant is obvious. As Justice RILEY observed in *Schumacher,* p 515, we face "the bitter choice of releasing outright a person who has inflicted . . . harm on the community, or of remanding for a

reconstructed waiver hearing, *nunc pro tunc.*"
Such a choice "satisfies neither the interests of
justice nor the juvenile's interest in rehabilita-
tion." Aware of these considerations, we hold that
defendant must be discharged. On a full and com-
plete record, the probate judge came to the wrong
conclusion. A reconstructed waiver hearing would
serve no purpose. Had the probate judge retained
jurisdiction, as we are convinced the facts war-
ranted, the defendant would have been released
over four years ago. Instead, he has spent the
intervening years in the adult correctional sys-
tem.[8]

We order that defendant's conviction be reversed
and defendant discharged forthwith.

WILLIAMS, C.J., and LEVIN and BRICKLEY, JJ.,
concurred with CAVANAGH, J.

BOYLE, J. (*dissenting*). The principal issue in this
case is the propriety of a probate court waiver of
jurisdiction over a sixteen-year-old defendant
which allowed him to be tried as an adult and,
upon conviction, sentenced to a mandatory term of
life imprisonment for first-degree murder. Resolu-
tion of this issue involves consideration of the
legal sufficiency of the evidence presented at the

---

[8] In *Schumacher,* p 515, Justice RILEY urged this Court to promul-
gate a court rule which would accelerate the appellate procedure for
reviewing probate court orders waiving jurisdiction. The need for such
a rule is evident from the facts of this case. Jurisdiction was waived
in September, 1978, and defendant promptly appealed this determina-
tion. The circuit court did not decide the appeal until July, 1979,
several months after defendant was tried and sentenced. The Court of
Appeals affirmed the waiver order and the conviction two years later.

The bench and bar are respectfully advised that, pursuant to MCR
1.201, the Court has this day notified the Juvenile Court Rules
Committee to prepare and publish for comment a court rule providing
for an expedited appeal of a probate court order waiving jurisdiction
over a juvenile. Following publication and comment, this Court will
consider the wisdom of such an amendment and will take appropriate
action.

waiver-disposition hearing and the juvenile court's findings of fact in support of that decision.

We conclude that the appropriate standard for review is that set forth in *People v Schumacher,* 75 Mich App 505; 256 NW2d 39 (1977), and that the record sufficiently supports the decision of the probate court. Therefore we dissent from the order discharging the defendant. We would affirm the Court of Appeals and the order of waiver of the probate court.

I

## Facts and Procedural History

Defendant, Jeffrey Dunbar, was arrested on or about July 23, 1978, at the age of sixteen and charged in the Wayne County Probate Court, Juvenile Division, with first-degree felony murder and armed robbery, both stemming from the same incident. The defendant was one of several individuals who participated in an attack on Dennis Rhodes in order to steal the ten-speed bicycle he was riding. The victim was beaten and stabbed, and died as a result of multiple wounds sustained in an effort to prevent defendant and the others from taking the bicycle.

The Wayne County Prosecutor filed a motion pursuant to MCL 712A.4; MSA 27.3178(598.4), in the Juvenile Division of the Wayne County Probate Court, requesting waiver of jurisdiction to the Recorder's Court for the City of Detroit.

On August 23, 1978, probable cause was established by stipulation of the parties for the purposes of phase one of the waiver hearing, and the court commenced a complete investigation of defendant's psychosocial background in order to provide a basis for determining "whether the inter-

ests of the child and the public would best be served by granting a waiver of jurisdiction" for the purposes of the second phase of the waiver decision.[1]

On September 27 and 28 of 1978, the juvenile court judge heard the testimony of a number of expert witnesses who had assisted in conducting the investigation of the defendant, many of whom were familiar with the resources available in both the adult and juvenile correctional system. These included a psychologist who had tested and interviewed the defendant, a psychiatric social worker, a probation officer who had worked on the case, and an administrator of the Department of Social Services.

The defendant presented the testimony of a teacher he had known in elementary school, a neighbor, a teacher who had known the defendant since his confinement two months earlier, and his family minister. After hearing the testimony of the witnesses and considering all of the evidence, the probate judge made the following specific findings on the record on each of the five criteria listed in the juvenile court rule and statute:[2]

---

[1] A hearing to determine whether the juvenile division should waive jurisdiction consists of two phases that are outlined in MCR 5.911(A)(1).

"Phase 1: Showing of Probable Cause. The court shall first determine if a crime has been committed, which, if committed by an adult, would be a felony, and if there is probable cause to believe that the child committed the crime. The determination must be based on legally admissible evidence.

"Phase 2: Criteria for Waiver. On a showing of probable cause, the court shall conduct a full investigation to determine whether the interests of the child and the public would best be served by granting a waiver of jurisdiction to a court of criminal jurisdiction."

As the notes to the Michigan Court Rules of 1985 indicate, MCR 5.911 which took effect on March 1, 1985, is substantially the same as JCR 1969, 11.1, the rule in effect at all times pertinent to this action.

[2] MCR 5.911(A)(2) provides that

"In making the determination, the court shall consider and make findings on the following criteria before a waiver is granted:

The Court has considered the five criteria as established by the Michigan Supreme Court court rules. As to the first criteria, the Court finds from the testimony that the respondent has no adjudicative Juvenile Court record, and from the testimony that he's physically mature, from the testimony that his pattern of living is acceptable under the particular situation where he lives. And that situation is found to be from the testimony, a high crime area and one in which several gangs inhabit. The Court finds that the absence of the respondent from school for one year may be because of the beating administered to him because of his brother but the Court is not convinced that the staying out of school is the best possible decision and resolution to that possible reason for staying out of school.

The Court in criteria one has considered the

"(a) the child's prior record and character, physical and mental maturity, and pattern of living;

"(b) the seriousness of the offense;

"(c) even though less serious, if the offense is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under the regular statutory juvenile procedures;

"(d) the relative suitability of programs and facilities available to the juvenile and criminal courts for the child;

"(e) whether the best interests of the public welfare and the protection of the public security, generally, require that the child stand trial as an adult offender."

A similar provision is found in MCL 712A.4; MSA 27.3178(598.4):

"(4) Upon a showing of probable cause, the court shall conduct a hearing to determine whether or not the interests of the child and the public would be served best by granting a waiver of jurisdiction to the criminal court. In making the determination, the court shall consider the following criteria:

"(a) The prior record and character of the child, his physical and mental maturity and his pattern of living.

"(b) The seriousness of the offense.

"(c) Whether the offense, even if less serious, is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under existing juvenile programs and statutory procedures.

"(d) The relative suitability of programs and facilities available to the juvenile and criminal courts for the child.

"(e) Whether it is in the best interests of the public welfare and the protection of the public security that the child stand trial as an adult offender."

testimony of the defense's presented witnesses. Mr. Andrews, the fifth and sixth grade school teacher who testified that while in the fifth or sixth grade that the respondent did well in school and presented no particular problem, if any, to the school people. The same pattern has been existent as is testified by Mr. Martin in the Youth Home since his stay there on July 26, 1978, and that he has been no problem there. And the testimony of the Reverend Mitchell indicates that the family itself is a good family.

The seriousness of the offense is the next criteria; the stipulation with the court with the allegations in the petition. The Court does find without equivocation that the taking of a human life is a serious crime. That that human being has every right to live as much as Jeffrey has a right to live, and he no longer can exercise that right. So without belaboring that point, the Court finds from the petition that the offense is the most serious in our penal code; that it is not a less serious offense and that Jeffrey does not have a repetitive pattern of offenses that would lead this Court to determine that he is beyond rehabilitation under the regular statutory juvenile procedures.

Now, the Court has considered the forth [*sic*] criteria, the relative suitability of the programs and facilities available to the juvenile and criminal courts for the child. From the testimony, the Court determines that part of the needs of the respondent here are educational and vocational. That he's reading at a 4.5 grade level and the Court determines that this has to be brought up in order to function at least to perhaps a 6.0 grade level or a 6.5 grade level, and hopefully right up to an eigth [*sic*] grade level. That in order to function in any other area there are certain basic skills which the reading level is an indicia; that these skills are lacking and that in order to gain these skills that really must be brought up. He has done well earlier in school in math as was testimony in the record which demonstrates to this Court that there's a potential for him to improve himself to become a functioning citizen.

He has expressed a desire as has been testified here to become a mechanic. The educational facilities at the adult and at the juvenile levels has [*sic*] been weighed. At the juvenile level there is a reading program there and there's a preliminary vocational program there. The familiarity as was testified to the average length of stay is eight months. That in the adult level there's a full vocational program and there's an additional program that runs at least through the high school. And that the length of stay, of course, would be determined by sentence in the adult court if he were convicted and his ultimate placement would in part be determined by the length of time that he would spend there.

The Court has considered the criteria where it is found to be in the best interests of the public welfare and for the protection of the public security, generally, that said juvenile be required to stand trial as an adult offender. The Court in its investigation of the interests of the child and the public has determined that Jeffrey needs an educational backing that is lacking in the juvenile system. It is going to take more time than the juvenile system can afford him to bring his reading skills up and other skills. And he certainly hasn't helped himself educationally by remaining out of school for the past one year and this unfortunately works to Jeffrey's detriment. In his best interests, he has to bring that educational level up and that in the best interests of the public that he has to bring that level up.

As to vocational matters, I think that the Court feels that the adult system, as the testimony shows, is far superior to the juvenile facilities and that he would better be able to function in a free society after gaining educational and vocational training. And that the interests of the public welfare and the protection of the public security indicate that Jeffrey is not of such a position at this time to function adequately in society. That he needs something that must be given to him in a more structured setting than he receives at home.

Therefore, it is the Court's decision that the Motion requesting Waiver of Jurisdiction on Jeffrey Dunbar to the adult court be granted and that Jeffrey will stand trial in the Detroit Recorder's Court and he will be conveyed on the other procedures to the Wayne County Jail awaiting his arraignment in Recorder's Court.

The probate judge's decision to waive jurisdiction was timely appealed to the Wayne Circuit Court pursuant to MCL 712A.22; MSA 27.3178(598.22) (repealed by 1978 PA 543, § 1, effective July 1, 1979, and replaced by MCL 600.863; MSA 27A.863), which affirmed the waiver decision on July 20, 1979, several months after the defendant's trial and sentencing.[3]

On July 29, 1981, in an unpublished per curiam opinion, the Court of Appeals affirmed the defendant's waiver and his conviction as an adult. This Court granted leave to appeal on March 29, 1984. 419 Mich 855 (1984).

II

While this Court has never spoken to the question of the standards for appellate review in juvenile waiver cases, the subject has arisen in the Court of Appeals. The leading decision from that Court is that of Justice RILEY in *People v Schumacher,* 75 Mich App 505; 256 NW2d 39 (1977). In that decision, the Court of Appeals observed the tension that may exist between the goals of caring for the child and protection of society.

Justice RILEY recognized the general philosophy expressed in the court rule applicable to waiver proceedings which provides that

---

[3] Defendant was convicted of felony murder in the Recorder's Court for the City of Detroit on November 24, 1978, and, on December 1, 1978, he was sentenced to the mandatory term of life imprisonment.

[a]lthough the procedures are not criminal, the court and its officers shall proceed in a manner so as to safeguard procedural rights and the proper interests of the child . . . and the public. [MCR 5.901(B).]

She also pointed out the requirement that the rules be construed in keeping with the philosophy expressed in the preamble of the Juvenile Code, MCL 712A.1; MSA 27.3178(598.1), that each child coming within the jurisdiction of the court receive the care, guidance, and control conducive to the child's welfare and the best interests of the state. MCR 5.901(B)(1).

Thus, there are two considerations involved in reviewing a juvenile waiver—the interests of the child, and the interests of society. While these interests are often identical, conflicts occasionally arise. It is then that the administration of justice must grapple with the problem of determining— under the concrete facts of a given case—whether the needs of the child or the needs of society as a whole must predominate.

In light of these sometimes conflicting considerations, the Court of Appeals held in *Schumacher* that an order waiving jurisdiction should be affirmed whenever the probate judge finds, on the basis of substantial evidence and thorough investigation, that either the juvenile is not amenable to treatment or, despite a potential for treatment, the nature of his difficulty is likely to render the juvenile dangerous to the public if released at age nineteen, when juvenile jurisdiction ceases, or disruptive of the rehabilitation of other juveniles prior to his release. *Schumacher, supra,* p 512. The Court of Appeals chose to emphasize, moreover, that the seriousness of the offense "may not alone be used to determine the likelihood that a poten-

tially amenable juvenile will endanger the public or other children . . . ." *Id.* Noting that both the Legislature and this Court have directed that all five waiver criteria be considered, the Court of Appeals concluded that "no reason appears why the 'seriousness of the offense' should gain preeminence over other factors to be assessed."

We approve the soundness of the *Schumacher* approach and adopt the standard set forth therein for review of a probate court order waiving jurisdiction. A waiver does not require the prosecutor to show that the child is not amenable to treatment as a juvenile. The question of waiver is more complex, requiring a delicate balance "between the often competing interests of the juvenile and society," *id.,* to ensure that the court does not treat children as criminals—or criminals as children. A minor's "amenab[ility] to treatment" is a significant factor, but not the paramount one; and as "the seriousness of the offense" alone may not "gain preeminence over the other factors to be assessed," *id.,* neither may a juvenile's amenability to treatment. As Justice RILEY noted in *Schumacher, supra* at 512: "The Legislature and the Supreme Court have indicated by statute and rule, respectively, that all of the waiver criteria shall be considered . . . ."[4]

Therefore, we agree with the Court of Appeals conclusion in this case that the probate judge considered all of the relevant criteria, and that the "findings were based upon substantial evidence including relative suitability of programs and facil-

---

[4] Because many lower courts have interpreted *Schumacher* to require findings on "amenability" as an additional requirement, we wish to emphasize at this time that we do not read *Schumacher* as superimposing upon the criteria already provided by statute and court rule, a rule requiring additional findings on the juvenile's amenability to treatment, or giving undue weight or preeminence to the factors under which "amenability" to rehabilitation is considered.

ities, defendant's personality and needs, as well as
the seriousness of the offense." Review of the
probate court's findings of fact and the evidence
presented in this case mandates the conclusion
that the court's decision waiving jurisdiction was
correct.

The facts of this case show that defendant was a
principal actor in a brutal robbery-murder. The
victim attempted to protect himself and his prop-
erty by fighting off his three assailants with his
bicycle chain. Defendant and his companions re-
newed the attack after their victim had collapsed
from his wounds. Defendant himself seized the
bicycle chain and beat the dying young man while
one of his accomplices attacked the victim with a
tire jack and the other used a knife to pry the
deceased's hand away from the bicycle. Thus, the
record graphically demonstrates not only the grav-
ity of the offense, but the extent of the danger
defendant presents to the public.

There was also testimony given by expert wit-
nesses that defendant was physically and mentally
mature and that his crime was not the result of
immaturity. Other testimony suggested that defen-
dant possessed a manipulative personality, render-
ing it unlikely that he would find treatment as a
juvenile to be an effective rehabilitant. The juve-
nile court psychologist testified that defendant's
feelings about the young man he had helped kill
were "superficial"—his "negative attitudes about
murder" consisted of the feeling that it was "too
bad this guy had to be killed,"—and that "his
primary concern at the time of [the] evaluation
[was] what's going to happen to him." These are
not the attitudes of a misguided child. The testi-
mony of the expert witness who recommended
waiver provided a firm basis for the court's conclu-
sion that the juvenile system simply had nothing

to offer someone with defendant's background and problems.

There is no question but that defendant stood charged with a serious offense; the court also found that "the interests of the public welfare and the protection of public security indicate that [defendant] is not of such a position at this time to function adequately in society." Thus, the court found against defendant on the two criteria related to public safety—MCL 712A.4(4)(b), (e); MSA 27.3178(598.4)(4)(b), (e). The record amply supports such a conclusion, and, even standing alone, such findings suffice to mandate affirming the order of waiver. *People v Schumacher, supra; In re Evans,* 99 Mich App 466; 297 NW2d 873 (1980). As to the "relative suitability of programs and facilities available to the juvenile and criminal courts for the child," MCL 712A.4(4)(d); MSA 27.3178(598.4)(4)(d), the court concluded that

> [t]he Court in its investigation of the interests of the child and the public has determined the [defendant] needs an educational backing that is lacking in the juvenile system. It is going to take more time than the juvenile system can afford him to bring his reading skills up and other skills. And he certainly hasn't helped himself educationally by remaining out of school for the past one year . . . .
>
> As to vocational matters, I think that the Court feels that the adult system, as the testimony shows, is far superior to the juvenile facilities and that he would better be able to function in a free society after gaining educational and vocational training.

Given these findings, we are unable to agree with the conclusion of the majority. Nor can we agree that the probate court erred in taking into account the relatively short rehabilitation period available

within the juvenile system, *In re P H v Alaska,* 504 P2d 837 (Alas, 1972).

The majority purports to adopt a standard for appellate review of a waiver of a juvenile which requires affirmance whenever the probate judge has found on the basis of substantial evidence that waiver is appropriate. This standard is consistent with the statutory directive that appellate review may not be de novo, MCL 701.45a(2); MSA 27.3178(45.1)(2), now MCL 600.866(1); MSA 27A.866(1). The Court has in fact, however, reviewed the case de novo, substituted its judgment for that of the probate court and has invalidated a waiver decision which the majority admits is supported by the record. The result is discharge of an individual whom the probate judge properly waived and whom twelve citizens found guilty beyond a reasonable doubt of first-degree murder.

The majority has not articulated a rule of law which requires this result. Nor has any standard of appellate review been advanced to justify the clear usurpation of the authority of the probate court. Albeit in a different context, the United States Supreme Court has recently reminded appellate courts that their function is not to decide cases de novo.

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. [*Anderson v Bessemer City,* 470 US 564; 105 S Ct 1504; 84 L Ed 2d 518, 528 (1985). See also *Wainwright v Witt,* 469 US 412; 105 S Ct 844; 83 L Ed 2d 841 (1985).]

Apart from any statutory limitation on appellate

review, Judge Patrick Higgenbotham, concurring specially in *O'Bryan v Estelle,* 714 F2d 365, 392 (CA 5, 1983), has explicated the institutional need for deference to trial court findings as follows:

> That an appellate court not simply ignore that the case has been earlier decided expresses in part a recognition that the trial court was more than an entrance gate. When an appellate court starts afresh, a trial court's function is reduced to that of collecting data and providing an opportunity for an extrajudicial resolution of the dispute. Even this function would experience a reduction in value as expectation of a judicial decision of consequence shifts wholly away from the trial court. The pyramidal shape of our present court structure rests on the institutional integrity of the trial court as a distinct part of the justice system. As such review is extended upward, only the last "court" in the chain retains full institutional integrity. More is afoot here than nostalgic or romantic reference for trial courts. Finality and all values bound up in that precept are implicated.

The fact that the defendant "had promise" in the retrospective view of the majority cannot justify the substitution of this Court's judgment for the decision of the probate court. Presumably, after today's decision, the institutional integrity of a waiver decision will be upheld only if the probate judge is able to accurately predict that the adult system will not deal with a waived defendant in a manner offensive to a majority of this Court.[5] We would affirm.

RYAN and RILEY, JJ., concurred with BOYLE, J.

---

[5] The sentence to which an accused may be subject if convicted in the adult system is not a proper consideration, under either the statutory or court rule criteria, in the probate court's initial waiver determination.