PEOPLE v HANA

Docket No. 94268. Argued April 1, 1993 (Calendar No. 9). Decided
    August 3, 1993. Certiorari denied by the Supreme Court of the
    United States on February 22, 1994, 510 US — (1994).

Kafan B. Hana, a 16½-year-old minor, was charged in the Ma-
    comb Probate Court with possession of more than 650 grams of
    cocaine, delivery of more than 225 but less than 650 grams of
    cocaine, conspiracy to induce a minor to commit a felony, and
    bribery of a public official. The prosecutor moved for waiver of
    jurisdiction to the Macomb Circuit Court to try the defendant
    as an adult. After a bifurcated hearing, the court, Robert E.
    Spier, J., concluded that there was probable cause to believe
    that the defendant committed the crimes and waived jurisdic-
    tion. The circuit court, John B. Bruff, J., concluded that there
    was ample evidence to support the waiver. Following trial, the
    defendant was convicted by a jury of the crimes charged,
    Frederick D. Balkwill, J. The Court of Appeals, Hood, P.J., and
    Sawyer, J. (Fitzgerald, J., concurring in part and dissenting
    in part), reversed in an unpublished opinion per curiam, hold-
    ing that the constitutional rights applicable in criminal pro-
    ceedings extend to the dispositional phase of a waiver hearing
    (Docket No. 119792). The people appeal.

    In an opinion by Justice Riley, joined by Justices Brickley,
    Boyle, Griffin, and Mallett, the Supreme Court held:

    The legislative purpose and the underpinnings of the Probate
    Code mandate that a probate court's discretion at the disposi-
    tional phase of a waiver hearing remains unfettered by eviden-

REFERENCES

Am Jur 2d, Juvenile Courts and Delinquent and Dependent Chil-
    dren §§ 34, 38, 44-48.
Applicability of double jeopardy to juvenile court proceedings. 5
    ALR4th 234.
Right to and appointment of counsel in juvenile court proceedings.
    60 ALR2d 691.
Right to jury trial in juvenile court delinquency proceedings. 100
    ALR2d 1241.
Procedural requirements under Federal Constitution in juvenile
    delinquency proceedings—federal cases. 25 L Ed 2d 950.

tiary requirements recognized in criminal proceedings already extended to the adjudicative phase of a waiver hearing.

1. Juvenile justice procedures are governed by statute and court rule. The hearing to determine whether juvenile court jurisdiction of a juvenile offender should be waived and the juvenile tried as an adult in circuit court involves two separate proceedings, as mandated by MCL 712A.4; MSA 27.3178(598.4) and MCR 5.950(B). The adjudicative phase, phase I, determines whether probable cause to suspect the defendant exists; the dispositional phase, phase II, determines whether waiver to an adult criminal court is appropriate. The evidentiary requirements for each phase differ. Only legally admissible evidence may be used in phase I; the Michigan Rules of Evidence do not apply in phase II. The appropriate standard for purposes of a phase II hearing is whether the interests of the juvenile and the public would best be served by granting the waiver. In short, the public policy underlying phase II requires relaxed evidentiary standards so as to ensure a full investigation.

2. In this case, the Court of Appeals misconstrued the purpose of phase II of the waiver hearing and the underpinnings of the Juvenile Code. The full panoply of constitutional rights provided by the Fifth and Sixth Amendments does not apply to phase II. The statutes and court rules concerning phase I, when properly applied, afford appropriate protection. Thus, because none of the alleged confessions or admissions were introduced at the adjudicative phase of the waiver hearing, there was no constitutional violation. Use of the defendant's alleged statements to the police and the court psychologist at the phase II hearing did not violate any constitutional provisions.

Reversed and remanded.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that while there may be instances in which it is necessary to waive jurisdiction over certain juvenile offenders, the decision to waive cannot be characterized as being consistent with the philosophy underlying the juvenile court system. In reality, the decision to waive juvenile court jurisdiction is not a decision to rehabilitate, but, rather, one to punish the juvenile upon conviction. Thus, the juvenile should be afforded the traditional due process protections in judicial waiver proceedings enjoyed by adults accused of crime.

CRIMINAL LAW — JUVENILES — PROBATE COURT — WAIVER HEARINGS — DISPOSITIONAL PHASE.

The full panoply of protections provided by the Fifth and Sixth Amendments of the United States Constitution does not apply

to the dispositional phase of a juvenile waiver hearing (MCL 712A.4; MSA 27.3178[598.4], MCR 5.950[B]).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Carl J. Marlinga,* Prosecuting Attorney, *Robert J. Berlin,* Chief Appellate Lawyer, and *Linda Davis,* Assistant Prosecuting Attorney, for the people.

*Neil H. Fink* and *Mark A. Kriger (Carole M. Stanyar,* of counsel), for the defendant.

RILEY, J. This case requires us to consider an intricate mix of factual and constitutional issues surrounding waiver procedures for juveniles pursuant to the provisions of the Probate Code[1] and related Michigan Court Rules.[2] The primary question is whether the full panoply of protections provided by the Fifth and Sixth Amendments of the United States Constitution apply to the dispositional phase, as well as to the adjudicative phase, of a juvenile waiver hearing. We hold that the legislative purpose and the underpinnings of the Probate Code mandate the conclusion that a probate court's discretion at the dispositional phase of a waiver hearing remains unfettered by certain evidentiary requirements recognized in criminal proceedings and already extended to the adjudicative phase of a waiver hearing. Accordingly, we reverse the decision of the Court of Appeals and remand the case for consideration of the remaining issues raised by defendant.

[1] 1939 PA 288, ch XII, as amended, now found at MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.*

[2] MCR 5.901 *et seq.*

I

FACTS AND PROCEEDINGS

On January 6, 1988, defendant was arrested[3] in a drug raid conducted by the City of Sterling Heights Police Department and charged with possession of more than 650 grams of a substance containing cocaine,[4] delivery of more than 225 but less than 650 grams of a substance containing cocaine,[5] conspiracy to induce a minor to commit a felony,[6] and bribery of a public official.[7] We turn first to the facts at issue beginning with the period immediately following defendant's arrest.

On the way to the police station, Officer Blasky testified that he informed defendant and his brother of their *Miranda*[8] rights. He also testified that he told defendant and his brother to refrain from talking to the officers because "it wasn't our job to interview them," and he warned them to be quiet when the brothers began talking to each other. According to Officer Blasky, defendant and his brother, who are of Arabic descent, seemed proficient in English, were not under the influence of any intoxicants, and appeared to understand their *Miranda* rights.

Shortly before arriving at the police station, the officers discovered that defendant was a juvenile.[9] Therefore, defendant was taken to the juvenile

_____

[3] Also arrested were defendant's brother and two others who had arranged with Officer Putnam to purchase twelve ounces of cocaine.

[4] MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i).

[5] MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii).

[6] MCL 750.157c; MSA 28.354(3).

[7] MCL 750.117; MSA 28.312.

[8] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[9] On the date of his arrest, defendant was 16½ years old.

bureau area of the station to await transfer to the youth home by a juvenile court officer.[10]

Officer Blasky testified that while waiting for the juvenile court officer, defendant boasted about his involvement in other drug deals, stated that he had been selling drugs for a few years, and claimed to have been selling up to twenty kilograms of cocaine per month. Officer O'Connor entered the room and told Officer Blasky and defendant that they had discovered a safe in defendant's bedroom. Officer Blasky asked defendant for the combination to the safe to make things easier because the police were already in the process of securing a search warrant and would gain access to the safe one way or another. Defendant began to cry, stated, "I'm dead," but ultimately gave police the combination to the safe.[11]

Shortly thereafter, Officer Brooks, the youth officer, arrived, and Officer Blasky left. Officer Brooks testified that he advised defendant of his *Miranda* rights, advised him not to discuss the evening's events until a parent or attorney was present, and asked if he understood his rights. Defendant acknowledged that he did, but nevertheless continued to make incriminating statements and was again warned not to speak without a parent or attorney present.

While in Officer Brooks' custody, defendant was permitted to make a phone call to his parents.[12] Officer Brooks testified that following the phone call defendant began asking if Brooks was the person who would decide whether defendant would

[10] According to Officer Blasky, this was the policy of the Sterling Heights Police Department.

[11] Defendant also allegedly stated that the police would have found approximately $300,000 in the safe had they searched it a day earlier.

[12] The record indicates that defendant was unable to contact his parents because they had left his uncle's house, but that they would be contacted as soon as they arrived home.

be detained overnight or released. Defendant then allegedly offered Officer Brooks a new pager, followed by offers of increasing amounts of money.[13]

Officer Dodt, who was assigned to drive defendant to the youth home, testified that defendant's conversation regarding the events of the evening included whether defendant would "flip himself over" and make a deal with the detectives to incriminate defendant's supplier, how much defendant made each month together with any commissions for selling cocaine over a certain price, the fact that defendant ordinarily sold to blacks in the City of Detroit, and that defendant went through with the sale that led to his arrest against his better judgment because he had incurred a gambling debt of approximately $11,000 the day before and was in need of money. Officer Dodt also testified that defendant expressed a desire to make $200,000 or $300,000, then "get out and live."[14]

Pursuant to the prosecutor's motion to waive jurisdiction over defendant for trial as an adult,[15] the probate court conducted bifurcated hearings early in February and March of 1988. At the probable cause phase of the waiver hearing (phase I), the prosecution offered the testimony of Officer Putnam, his supervisor, Officer Cleland, and another witness, all of whom had been involved in the drug raid. The prosecution also offered the testimony of Officer Brooks relating to the bribery charge. None of Officer Brooks' testimony involved

---

[13] These alleged offers formed the basis for the bribery of a public official charge.

[14] While transporting defendant to the youth home, Officer Dodt was requested via radio dispatch to ask defendant if there was any more money hidden in the home at which time defendant allegedly stated that there was $6,000 in a closet near the safe.

[15] The procedures for waiver are set forth in MCL 712A.4; MSA 27.3178(598.4) and MCR 5.950. MCL 712A.4; MSA 27.3178(598.4) was amended effective October 1, 1988. 1988 PA 182. The provisions relevant to this proceeding remain substantially unchanged.

any admissions or confessions allegedly made by defendant. At the close of the phase I segment of the waiver hearing, the probate court concluded that there was probable cause to believe that defendant committed the crimes charged as required by MCL 712A.4(3); MSA 27.3178(598.4)(3) and MCR 5.950(B)(1).

Several weeks later, the court conducted a hearing on the issue whether defendant should be treated as a juvenile or as an adult under the criteria set forth in MCL 712A.4(4); MSA 27.3178(598.4)(4) and MCR 5.950(B)(2) (phase II). At the phase II hearing, the probate court permitted testimony of the probate court psychologist[16] and Officers Blasky, Brooks, and Dodt concerning statements allegedly made by defendant after his arrest. The court's basis for admissibility was "that we're in phase II here, to determine . . . [respondent's] pattern of living, his character, and that sort of thing" rather than in the phase I probable cause stage. The court also listened to testimony of several witnesses who were alleged to have purchased narcotics from defendant in the past and from Lieutenant Tuttle of the Michigan State Police regarding the likely prior involvement in the drug world of someone entrusted to sell three kilograms of cocaine.

Defendant offered testimony of a character witness as well as the findings of his own psychologist. Following the phase II hearing, jurisdiction over defendant was waived.

Defendant appealed the waiver decision in the

---

[16] The record indicates that while defense counsel objected to the testimony of the police officers, defense counsel failed to object to testimony by the court psychologist that defendant admitted "to the offenses that he's being charged with . . . [and] that his involvement was a little more extensive and there were other things going on, he wasn't sure if he wanted to tell everything."

Macomb Circuit Court.[17] The circuit court concluded that there was ample evidence to support the waiver. However, the Court of Appeals, relying on *In re Gault,* 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967), reversed, holding that the constitutional rights applicable in criminal proceedings extended to phase II, the dispositional phase of a waiver hearing.[18] Moreover, the Court, drawing upon a trilogy of United States Supreme Court cases,[19] concluded that a waiver of this nature is tantamount to an enhancement of defendant's sentence, and thus required application to a phase II waiver hearing of the same constitutional protections found in criminal trials.

On November 17, 1992, this Court granted leave to appeal.[20]

II

HISTORICAL OVERVIEW

A

At common law, a child over the age of fourteen was presumed to have the mental capacity to form the mens rea required for specific intent crimes.[21]

---

[17] See MCL 600.863(1); MSA 27A.863(1) (authorizing a right of appeal directly to the appropriate circuit court of any order, sentence, or judgment of a probate court) and MCL 600.867; MSA 27A.867 (permitting suspension of further proceedings of the probate court pending an appeal to a circuit court).

[18] Unpublished opinion per curiam of the Court of Appeals, decided March 20, 1992 (Docket No. 119792).

[19] *Gault, supra; Kent v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966); *Estelle v Smith,* 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981).

[20] 441 Mich 883.

[21] 1 Wharton, Criminal Law (14th ed), § 96, pp 426-427. See also Feld, *The juvenile court meets the principle of the offense: Legislative changes in juvenile waiver statutes,* 78 J Crim L & Criminology 471, 521 (1987), and authorities cited therein; McCarthy, *The role of the concept of responsibility in juvenile delinquency proceedings,* 10 U Mich J L Ref 181, 184-185 (1977).

As a result, juveniles from the age of fourteen could receive the same penalties as adult criminals.[22] This criminal accountability of juveniles extended to the highest level of punishment possible, capital punishment.[23]

Near the end of the nineteenth century, this country experienced a radical change in attitude regarding the treatment of children generally and in particular those caught up in the juvenile justice system. The exponents of what was called the Progressive Movement[24] began focusing on rehabilitation rather than on retribution, pursuant to the doctrine of parens patriae.[25]

The first true juvenile court was established by the Illinois Legislature in 1899.[26] The enabling legislation provided that the act "be liberally construed to the end that its purpose may be carried out, to wit: That, the care, custody and discipline of a child shall approximate as nearly as may be that which should be given by its parents . . . ."[27]

---

[22] Feld, n 21 supra at 524; McCarthy, n 21 supra at 185. See also Gault, supra at 16-17.

[23] See Feld, n 21 supra at 522, ns 177 and 178; Thompson v Oklahoma, 487 US 815, 832-833; 108 S Ct 2687; 101 L Ed 2d 702 (1988) (opinion of Stevens, J.).

[24] See, generally, Feld, n 21 supra at 474-475; Feld, Criminalizing juvenile justice: Rules of procedure for the juvenile court, 69 Minn L R 141, 142-151 (1984), and authorities cited therein.

[25] See Shears, Legal problems peculiar to children's courts, 48 ABA J 719, 720 (1962) ("The basic right of a juvenile is not to liberty but to custody. He has the right to have someone take care of him, and if his parents do not afford him this custodial privilege, the law must do so"), quoted in Gault, supra at 17, n 21. See, generally, 47 Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children, § 1 to § 8, pp 986-990.

[26] McCarthy, n 21 supra at 189.

[27] Id. at 189, quoting the Act of April 21, 1899, Ill Laws, Juvenile Courts, § 21. MCL 712A.1(2); MSA 27.3178(598.1)(2), which mirrors this philosophy, provides:

This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the [probate] court shall

Several states quickly followed Illinois' lead by enacting similar legislation, and by 1928, all but two states had adopted a juvenile court system.[28]

For nearly three quarters of a century, the laws and procedures surrounding juvenile courts remained virtually unchallenged and unchanged. However, in 1966, the United States Supreme Court in *Kent v United States,* 383 US 541, 556; 86 S Ct 1045; 16 L Ed 2d 84 (1966), concluded that waiver procedures for juveniles to criminal courts were "a 'critically important' action determining vitally important statutory rights of the juvenile." The *Kent* Court[29] extended to juveniles several constitutional rights recognized in adult criminal trials. A year later in *Gault,*[30] the Court stated that Fifth and Sixth Amendment rights recognized in adult criminal proceedings applied to juvenile proceedings.[31]

receive the care, guidance, and control, preferably in his or her own home, as will be conducive to the child's welfare and the best interest of the state. If a child is removed from the control of his or her parents, the child shall be placed in care as nearly as possible equivalent to the care which should have been given to the child by his or her parents.

[28] *Id.* at 189, ns 41 and 42 and accompanying text.

[29] Discussed *infra,* pp 215-216.

[30] Discussed *infra,* pp 216-217.

[31] In *In re Winship,* 397 US 358, 365-367; 90 S Ct 1068; 25 L Ed 2d 368 (1970), the Supreme Court extended the criminal standard of proof beyond a reasonable doubt to juvenile proceedings. However, the Supreme Court declined an invitation to require a jury trial in juvenile proceedings, requiring instead only "accurate factfinding," which could be satisfied by a judge or jury. See *McKeiver v Pennsylvania,* 403 US 528, 543; 91 S Ct 1976; 29 L Ed 2d 647 (1971) (opinion of Blackmun, J.).

Careful review of both *Kent* and *Gault* reveals a reluctance on the part of the United States Supreme Court to establish a clear link between the Fifth and Sixth Amendments, or even the *Miranda* case, to juvenile proceedings. Rather, both cases focus on general concepts of due process extended to juveniles pursuant to the Fourteenth Amendment. See *Kent, supra* at 562 ("[w]e do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative

This body of case law led to a significant increase in judicial and legislative action regarding juvenile justice procedures.[32] Particularly noteworthy is the fact that judicial extension of constitutional protections in juvenile proceedings led to legislative restriction of the sentencing discretion of the probate courts.[33] In short, the "constitutional domestication"[34] of the juvenile justice system prompted sentencing uniformity for more serious crimes via legislative enactment at the expense of sentencing flexibility.

---

hearing; but *we do hold that the hearing must measure up to the essentials of due process and fair treatment*") (emphasis added); *Gault, supra* at 13 ("neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"). We interpret this reluctance as recognition of the prevailing philosophy that sought to treat juveniles differently than adults and would require by its very nature a type of discretion alien to the adult criminal justice system.

A popular legislative resolution of this dilemma, in which Michigan participates, is the bifurcated waiver hearing that recognizes adult criminal protections in the adjudicative phase while retaining historical discretion in the dispositional phase. See Feld, *Legislative changes in juvenile waiver statutes,* n 21 *supra* at 487-491.

[32] See, e.g., Feld, *Criminalizing juvenile justice,* n 24 *supra* at 161-164.

[33] Professor Feld states:

Beginning in 1970, and in direct response to the Supreme Court's *Kent* decision, Congress excluded a catalogue of offenses from the jurisdiction of the juvenile courts of the District of Columbia. By 1975, four other states followed suit, and, by 1980, nine states excluded serious present offenses from juvenile court jurisdiction. The remaining states have acted similarly since 1980. Thus, *there is a very strong trend to legislatively excise the most serious young offenders from juvenile court jurisdiction* solely on the basis of their offense.

Regardless of the statutory details, *the thrust of these laws is to remove sentencing discretion from judges with respect to the juvenile or adult disposition* . . . . [Feld, *Legislative changes in juvenile waiver statutes,* n 21 *supra* at 517. Emphasis added.]

[34] This term appears to have been coined by Justice Roberts of the Supreme Court of Pennsylvania in state proceedings held in *McKeiver.* See *In re Terry* and *In re McKeiver,* 438 Pa 339, 346; 265 A2d 350 (1970).

B

Michigan's history regarding juvenile justice procedures parallels the national trend. The first provision for the establishment of probate courts in Michigan is found in the Constitution of 1835.[35] By 1850, the Michigan Constitution included a provision for the probate courts jurisdiction, to wit: "The jurisdiction, powers and duties of such courts shall be prescribed by law."[36] This constitutional empowerment has remained virtually unchanged.[37] Thereafter, the powers and duties of the probate courts were defined by the Legislature.[38]

The Michigan Legislature first authorized probate court jurisdiction over juveniles in 1905.[39] What would be considered Michigan's first waiver statute was passed in 1907.[40] In 1915, the Legislature passed a law requiring that juveniles who

[35] Const 1835, art 6, § 3 provided, in toto, "A Court of probate shall be established in each of the organized counties." Section 4 of art 6 provided that probate judges were to be elected to four-year terms by qualified voters within the several counties. Before the Constitution of 1835, matters that are ordinarily considered to be the subject of probate court jurisdiction were within the province of a three-member court empowered to pass judgments in accord with the extant common law. Northwest Ordinance of 1787, § 4.

[36] Const 1850, art 6, § 13.

[37] See Const 1963, art 6, § 15.

[38] See *Buback v Governor*, 380 Mich 209, 226; 156 NW2d 549 (1968) (the responsibility of defining probate court jurisdiction is the responsibility of the Legislature); *In re Chamberlain Estate*, 298 Mich 278, 283-284; 299 NW 82 (1941) (probate courts derive no power from the common law but must find warrant for all of their doings in the statutes).

[39] 1905 PA 312, § 1. A "delinquent child" subject to probate court jurisdiction was defined as any boy under sixteen years of age and any girl under the age of seventeen who, inter alia, violated a state law.

[40] 1907 PA 325, § 2, provided, in pertinent part:

Proceedings under this act shall not be deemed to be criminal proceedings and this act shall not prevent the trial by criminal procedure in the proper courts of children under fourteen years of age charged with the commission of a felony.

were arrested be taken immediately before the probate court.[41] In 1939, the Legislature made specific provision for waiver of jurisdiction over any child above the age of fifteen "charged with a felony which involves a maximum penalty of imprisonment for life or a term of more than 5 years" upon full investigation into the circumstances following a motion for waiver filed by the prosecutor.[42] By late 1988, legislation was passed creating a class of cases of a violent or drug-related nature for which waiver to an adult criminal court was automatic.[43]

### III

### ANALYSIS

It is against the foregoing historical backdrop that we consider defendant's argument that the waiver procedures provided in MCL 712A.4(3), (4); MSA 27.3178(598.4)(3), (4) and MCR 5.950(B) are unconstitutional. According to defendant, waiving probate jurisdiction over a minor is the harshest penalty that could be imposed on a juvenile, who could otherwise expect to be released at age nineteen, but for the waiver.[44]

1907 PA 325, § 1, also raised the age of delinquency for boys to seventeen years of age.

[41] 1915 PA 308, § 6. A similar provision is now found at MCL 764.27; MSA 28.886.

[42] 1939 PA 288, ch XII, § 26.

[43] 1988 PA 52, found at MCL 600.606; MSA 27A.606. Because the effective date of this act was October 1, 1988, it does not apply to defendant, although he was charged with one of the felonies listed in the automatic waiver statute, namely, MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i) (possession of more than 650 grams of a controlled substance).

[44] In Michigan, a probate court retains jurisdiction over juveniles who are committed to a state institution until the age of nineteen. See 1939 PA 288, ch XII, § 19. This section was amended effective October 1, 1988, by 1988 PA 54, ch XIIA, § 18c. See MCL 712A.18c(4); MSA 27.3178(598.18c)(4). The amendment retained the automatic

Defendant also notes that juvenile waiver proce-
dures are a "critical phase" of the judicial process,
so that certain rights, such as the right to counsel
and the right against self-incrimination, must be
recognized. See *Kent, supra* at 553; *Gault, supra* at
30-31. Defendant then directs our attention to
*Estelle v Smith,* 451 US 454, 462-463, 469-471; 101
S Ct 1866; 68 L Ed 2d 359 (1981), wherein the
United States Supreme Court ruled that all Fifth
and Sixth Amendment rights recognized in crimi-
nal trials applied to the sentencing phase of Texas'
bifurcated trial procedure in capital punishment
cases.[45]

The Court of Appeals treated *Kent, Gault* and
*Estelle* as dispositive. However, we conclude that
the Court's analysis of these cases is flawed, and
thus it erred in reversing the probate court's
decision to waive jurisdiction over defendant. A
careful review of the proceedings in these cases is
instructive.

In *Kent,* jurisdiction over a sixteen year old who
was charged with housebreaking, robbery, and
rape was waived by the District of Columbia Juve-
nile Court. The defendant was arrested and ques-
tioned for approximately seven hours, during
which time he apparently admitted involvement in
the offense and volunteered information concern-
ing similar offenses. After overnight detention in a
juvenile home, the defendant was released to po-
lice for another full day of interrogation and then
returned to the juvenile home where he remained
for a week without arraignment or determination
of probable cause.

---

release provision for juveniles reaching the age of nineteen, but it
also permitted extension of jurisdiction until age twenty-one for
certain offenses. See 1988 PA 54, ch XIIA, § 18d(1), now found at MCL
712A.18d(1); MSA 27.3178(598.18d)(1).

[45] The *Estelle* rationale was adopted in the adult criminal context
by this Court in *People v Wright,* 431 Mich 282; 430 NW2d 133 (1988).

No hearing was held on the defendant's motions to retain jurisdiction over him, and the court's waiver order was made without any findings or recitation of reasons for the waiver decision. After failing to secure a reversal through the District of Columbia's appellate process, the United States Supreme Court granted certiorari.[46] A five-justice majority held:

> [The District of Columbia waiver statute] assumes procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement of a *"full investigation."*
>
> *      *      *
>
> We do not consider whether, on the merits, [the defendant] should have been transferred; but there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons. [383 US 553-554. Emphasis added; citation omitted.][47]

In *Gault,* a fifteen-year-old boy was adjudicated a delinquent for making lewd or indecent remarks to a female neighbor by telephone. The boy was arrested and taken to a detention home. His detention pending a hearing had been imposed entirely

---

[46] 381 US 902 (1965).

[47] The majority also recognized the "considerable latitude" that the juvenile courts had when determining whether to waive or retain jurisdiction over a juvenile and held:

> This concern [lack of procedural safeguards and of solicitous care], however, does not induce us in this case to accept the invitation to rule that constitutional guaranties which would be applicable to adults charged with the serious offenses for which [the defendant] was tried must be applied in juvenile proceedings concerned with allegations of law violation. [383 US 556.]

as a result of statements made by him to the
juvenile court judge during proceedings at which
the complainant was absent, no testimony was
given, and no record was made. After a hearing
that shared many of the same infirmities as the
detention hearing, the defendant was committed to
the State Industrial School until the age of major-
ity.[48] *Id.* at 4-8.

The United States Supreme Court noted that the
Arizona Supreme Court had already recognized
that due process of law was a constitutional pre-
requisite to a finding of delinquency that entailed
commitment to an institution. *Id.* at 12. The ma-
jority stated:

> We conclude that the Due Process Clause of the
> Fourteenth Amendment requires that in respect of
> proceedings to determine delinquency which may
> result in commitment to an institution in which
> the juvenile's freedom is curtailed, the child and
> his parents must be notified of the child's right to
> be represented by counsel retained by them, or if
> they are unable to afford counsel, that counsel will
> be appointed to represent the child. [*Id.* at 41.][49]

Finally, in *Estelle,* the United States Supreme
Court was asked to review the constitutionality of
using psychiatric testimony at the sentencing
phase of a bifurcated, capital murder trial where

---

[48] Then twenty-one years of age in Arizona.

[49] The *Gault* majority did, however, add the following caveat:

> We do not in this opinion consider the impact of these
> constitutional provisions upon the totality of the relationship of
> the juvenile and the state. We do not even consider the entire
> process relating to juvenile "delinquents." For example, we are
> not here concerned with the procedures or constitutional rights
> applicable to the pre-judicial stages of the juvenile process, nor
> do we direct our attention to the post-adjudicative or disposi-
> tional process. [*Id.* at 13.]

the defendant and his counsel were not warned beforehand that his statements could be used in the prosecution's case in the death penalty phase. The prosecution asserted that the evidence was admissible because it was not offered to establish guilt, which had already been decided against the defendant. Finding for the defendant, the Supreme Court concluded:

> We agree with the Court of Appeals that respondent's Fifth Amendment rights were violated by the admission of Dr. Grigson's testimony at the penalty phase.
> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. [*Estelle, supra* at 468 (opinion of Burger, C.J.).][50]

On the basis of the foregoing, it is clear that *Kent, Gault,* and *Estelle* are significantly distinguishable from the instant case and do not support the conclusion reached by the Court of Appeals in reversing the probate court's waiver decision. The

---

[50] In addition, the Court held:

Because "[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege," the assertion of that right "often depends upon legal advice from someone who is trained and skilled in the subject matter." *Maness v Meyers,* 419 US 449, 466 [95 S Ct 584; 42 L Ed 2d 574] (1975).

\* \* \*

Therefore, in addition to the Fifth Amendment considerations, the death penalty was improperly imposed on respondent because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of respondent's Sixth Amendment right to the assistance of counsel. [*Estelle, supra* at 471.]

*Kent* holding requires a degree of procedural regularity in juvenile waiver hearings that comports with "the basic requirements of due process and fairness" and "full investigation." *Kent, supra* at 553. Accordingly, juvenile courts are required to establish hearing procedures, afford the right to counsel, and set forth their findings to avoid arbitrariness and the inability to review waiver dispositions for lack of clear findings. *Gault* assured a juvenile the right to counsel at waiver proceedings, including the right to proper notification of this right and the right to appointment of counsel in appropriate circumstances. Neither *Kent* nor *Gault* extended these constitutional protections to the dispositional phase of the waiver hearing[51] that focuses on balancing the interests of both the juvenile and the public.

In *Estelle,* the United States Supreme Court extended Fifth and Sixth Amendment rights to psychiatric examinations used at the penalty phase of a capital murder case to enhance the sentence *after* guilt had been established. In contrast, a juvenile waiver decision is distinguishable because it is a hearing to determine probable cause (phase I) and to determine whether the best interests of the public and the juvenile would be served by waiving jurisdiction of the juvenile to an adult court (phase II). Thus, the waiver hearing *precedes* any determination of guilt. Therefore, neither the *Estelle* holding nor the holdings of *Kent* and *Gault* mandate extending protections presently applicable to phase I hearings to phase II hearings.[52]

Defendant argues that waiver is the harshest

[51] See ns 47 and 49.

[52] Our review of the case law reveals that only two jurisdictions have adopted the constitutional argument proffered by defendant. In *R H v State,* 777 P2d 204 (Alas App, 1989), an appellate court concluded that the compulsion to submit to a psychiatric examination

penalty that could be imposed on him. We dis-
agree. In cases where a juvenile is waived to an
adult criminal court, the juvenile is still afforded a
right to jury trial and the presumption of inno-
cence, and he is therefore not truly subjected to a
harsher penalty *because guilt is not yet estab-
lished.* Moreover, we are unaware of a constitu-
tional right to be treated as a juvenile.[53] Rather,
and in derogation of the common law, juvenile
justice procedures are governed by statutes and
court rules that the probate courts are required to
follow in the absence of constitutional infirmity. It
is to these provisions that we now turn.

The statute[54] and the court rule[55] involved here

---

without proper Fifth Amendment warnings violated the juvenile's
constitutional right against self-incrimination. *Id.* at 211. According to
that court, the psychiatric testimony "involved in furthering the
interests of the child's formal adversary" and exposed the juvenile "to
potential punishment far more severe than could otherwise have been
visited upon him." *Id.* at 210. In *Commonwealth v Wayne W,* 414
Mass 218; 606 NE2d 1323 (1993), the Supreme Judicial Court of
Massachusetts concluded that the Fifth Amendment precludes com-
pelled self-incrimination at a psychological examination ordered for
the dispositional phase of a juvenile transfer proceeding unless the
juvenile first offers psychiatric evidence. We believe that this position
fails to adequately consider the history of juvenile proceedings and
that the legislative intent behind the Michigan statutes does not
permit a similar interpretation. For these reasons, we decline to
follow the holdings in *R H* and *Wayne W.*

[53] See *Wayne W,* n 52 *supra* (juveniles charged with murder do not
have a constitutional right to be retained in the juvenile justice
system).

[54] Former MCL 712A.4; MSA 27.3178(598.4) provided:

(3) Before the court waives jurisdiction, it shall determine if
there is probable cause to believe that the child committed an
offense which if committed by an adult would be a felony.

(4) Upon a showing of probable cause, the court shall conduct
a hearing to determine whether or not the interests of the child
and the public would be served best by granting a waiver of
jurisdiction to the criminal court. In making the determination,
the court shall consider the following criteria:

(a) The prior record and character of the child, his physical
and mental maturity and his pattern of living.

(b) The seriousness of the offense.

(c) Whether the offense, even if less serious, is part of a repetitive pattern of offenses which would lead to a determination that the child may be beyond rehabilitation under existing juvenile programs and statutory procedures.

(d) The relative suitability of programs and facilities available to the juvenile and criminal courts for the child.

(e) Whether it is in the best interests of the public welfare and the protection of the public security that the child stand trial as an adult offender.

[55] MCR 5.950(B) provides:

(1) First Phase. The first-phase hearing is to determine whether there is probable cause that an offense has been committed which if committed by an adult would be a felony, and that there is probable cause that the juvenile who is 15 years of age or older committed the offense.

\* \* \*

(b) At the hearing, *the prosecuting attorney has the burden to present legally admissible evidence* to establish each element of the offense and to establish probable cause that the juvenile committed the offense.

\* \* \*

(2) Second Phase. If the court finds the requisite probable cause at the first-phase hearing . . . the second-phase hearing shall be held to determine whether the interests of the juvenile and the public would best be served by granting the motion.

\* \* \*

(b) The prosecuting attorney has the burden of establishing by a preponderance of the evidence that the best interests of the juvenile and the public would be served by waiver. *The Michigan Rules of Evidence do not apply to the second phase of the waiver hearing.*

(c) The court, in determining whether to waive the juvenile to the court having general criminal jurisdiction, shall consider and make findings on the following criteria, giving each weight as appropriate to the circumstances:

(i) the juvenile's prior record and character, physical and mental maturity, and pattern of living;

(ii) the seriousness of the offense;

(iii) whether the offense is part of a repetitive pattern of offenses which would lead to the determination either that the juvenile is not amenable to treatment, or that, owing to the nature of the delinquent behavior, the juvenile is likely to disrupt the rehabilitation of others in the treatment program, despite the juvenile's potential for treatment;

(iv) whether, despite the juvenile's potential for treatment, the nature of the juvenile's delinquent behavior is likely to render the juvenile dangerous to the public when released at age 19 or 21;

both mandate a bifurcated waiver hearing to determine in separate proceedings whether probable cause to suspect a defendant exists, phase I, and whether waiver to an adult criminal court is appropriate, phase II. The evidentiary requirements for admissibility differ at each phase of a juvenile waiver hearing. Although the statute is silent on the matter, the court rule provides that only "legally admissible evidence" may be used to establish probable cause in phase I of a waiver hearing while "[t]he Michigan Rules of Evidence do not apply to . . . [phase II] of the waiver hearing."[56]

In the recent past, this Court has adopted a number of significant revisions to the court rules for the purpose of clarifying juvenile court procedures.[57] To aid the bench and bar, we have declared that these rules "are to be construed to secure fairness, flexibility, and simplicity" so that the rights and proper interests of *all* parties concerned are protected. See MCR 5.902(A). The ap-

---

(v) whether the juvenile is more likely to be rehabilitated by the services and facilities available in adult programs and procedures than in juvenile programs and procedures;

(vi) whether the best interest of the public welfare and the protection of the public security require that the juvenile stand trial as an adult offender. [Emphasis added.]

[56] See 1985 MCR 5.911(A)(1) which, prior to amendment, provided:

Phase I: Showing of Probable Cause. The court shall first determine if a crime has been committed . . . . *The determination must be based on legally admissible evidence.* [Emphasis added.]

See also *People v Williams,* 111 Mich App 818; 314 NW2d 769 (1981) (noting that phase I of a waiver hearing, which is analogous to a preliminary examination, requires proof of probable cause only through use of legally admissible evidence while phase II, which is more like the sentencing phase of a criminal trial, is not similarly restricted).

[57] See n 2. Prior to 1988, the Probate Code contained fourteen provisions regarding proceedings in the juvenile division of probate court. Today, there are forty-one provisions under the same subchapter.

propriate standard for purposes of a phase II hearing is "whether the interests of the juvenile *and the public* would best be served by granting the motion [for waiver]." MCR 5.950(B)(2) (emphasis added). Former MCR 5.911(A)(2) required a "full investigation" into these interests and provided a five-factor test that has been carried over to MCR 5.950(B)(2)(c) without substantial change.[58] (See also former JCR 1969, 11.) In short, we believe that the public policy underlying phase II hearings requires relaxed evidentiary standards so as to ensure a "full investigation."[59]

The special role played by the phase II hearing

---

[58] The proper standard for appellate review is found in *People v Dunbar,* 423 Mich 380, 387; 377 NW2d 262 (1985), in which this Court held:

> [A]n order waiving jurisdiction will be affirmed whenever the judge's findings, based upon substantial evidence and upon thorough investigation, show either that the juvenile is not amenable to treatment, or, that despite his potential for treatment, "the nature of his difficulty is likely to render him dangerous to the public if released at age [nineteen], or to disrupt the rehabilitation of other children in the program prior to his release." [Quoting *People v Schumacher,* 75 Mich App 505, 511-512; 256 NW2d 39 (1977). Citations omitted.]

See also *People v Fowler,* 193 Mich App 358, 363; 483 NW2d 626 (1992).

[59] Moreover, we draw attention to the fact that the Michigan Legislature (effective October 1, 1988) went one step further by providing for *automatic waiver* from probate court, *without any investigation,* for juveniles over the age of fifteen, charged with any of nine serious felonies. See MCL 712A.2(a)(2); MSA 27.3178(598.2)(a)(2) and MCL 600.606; MSA 27A.606. The automatic waiver felonies are MCL 750.83; MSA 28.278 (assault with intent to commit murder); MCL 750.89; MSA 28.284 (armed assault with intent to rob); MCL 750.91; MSA 28.286 (attempted murder by nonassaultive means, e.g., poisoning); MCL 750.316; MSA 28.548 (first-degree murder); MCL 750.317; MSA 28.549 (second-degree murder); MCL 750.520b; MSA 28.788(2) (first-degree criminal sexual conduct); MCL 750.529; MSA 28.797 (armed robbery); *MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i) (manufacture or possession of 650 grams or more of a controlled substance with intent to deliver); MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i) (possession of 650 grams or more of a controlled substance).*

is further illustrated by MCL 769.1(3); MSA
28.1072(3)[60] and MCR 6.931, which provides for a
juvenile sentencing hearing in *automatic waiver*
cases where juveniles have been convicted of a life
offense following an adult criminal trial. This
"waiver-back" procedure requires the equivalent of
a phase II hearing whose criteria correspond point
for point to the criteria found in MCL 712A.4(4);
MSA 27.3178(598.4)(4) and MCR 5.950(B)(2), see
MCR 6.931(E)(3), in cases of automatic waiver. See
MCR 6.901(B). Although the burden of proving
that a juvenile should be sentenced as an adult is
on the prosecutor, MCR 6.931(E)(2), "all relevant
and material evidence may be received by the
court and relied upon to the extent of its probative
value, *even though such evidence may not be
admissible at trial.*" MCR 6.931(E)(1) (emphasis
added). Thus, the waiver-back hearing mandates
the use of the same flexible evidentiary standard
found in phase II hearings even though guilt has
been established.

On the basis of the foregoing, we are persuaded
that the Court of Appeals misconstrued the pur-
pose of phase II of a waiver hearing and the
underpinnings of the Juvenile Code. The require-
ments of a full investigation, protection of juve-
niles as well as the public, and the historic discre-
tion afforded our probate courts in these matters
convince us that the full panoply of constitutional
rights was never intended to apply to the disposi-
tional phase of a waiver hearing.[61]

---

[60] This subsection was added by 1988 PA 78.

[61] Moreover, our review of the probate court record persuades us
that defendant's phase I hearing was properly sanitized to prevent the
possibility of taint from the allegedly involuntary confessions. The
prosecution offered the testimony of a witness arrested in the same
transaction as defendant and two officers who were involved in the
controlled purchase operation. Although the testimony of Officer
Brooks was offered, it was limited to establishing probable cause for

IV

CONCLUSION

We conclude that the constitutional protections extended to juvenile proceedings in cases such as *Kent* and *Gault* apply in full force to the adjudicative phase of a juvenile waiver hearing.[62] We also find that the statutes and court rules concerning phase I hearings, when properly applied, afford the appropriate protection. Thus, because none of the alleged confessions or admissions were introduced at the phase I adjudicative phase of the waiver hearing, there was no constitutional violation.[63] We conclude further that the full panoply of constitutional rights asserted by defendant does not

the bribery charge and did not implicate any admissions or confessions allegedly made by defendant at the police station.

[62] The courts of this state have already recognized these rights applicable to the adjudicative phase of a waiver hearing. See, e.g., *Williams*, n 56 *supra* (only legally admissible evidence is admissible at the adjudicative phase of a waiver hearing); *People v Good*, 186 Mich App 180; 463 NW2d 213 (1990) (voluntariness of a confession must be established before it may be considered at the adjudicative phase of a waiver hearing); *People v McGilmer*, 95 Mich App 577; 291 NW2d 128 (1980) (Michigan courts apply the *Kent* right to counsel at juvenile proceedings prospectively).

MCL 712A.4(9); MSA 27.3178(598.4)(9), added by 1988 PA 182, now provides that "[t]he probable cause finding [phase I] shall satisfy the requirements of and be considered the equivalent of the preliminary examination required by [MCL 766.4; MSA 28.922]." Accordingly, juveniles must be afforded the same constitutional protections as adults at the phase I stage of a waiver hearing, including the right to a pretrial hearing regarding the voluntariness of alleged admissions or confessions, see, e.g., *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965), and the right to counsel at any critical stage of the criminal proceedings. See *People v Martin #2*, 21 Mich App 667; 176 NW2d 470 (1970) (denial of effective cross-examination of witnesses at the preliminary examination, which is presumed when the defendant is without counsel, would make any testimony elicited at the preliminary examination inadmissible at a subsequent trial).

[63] This jurisdiction has adopted the "totality of the circumstances" test to determine the voluntariness of confessions sought to be admitted at a phase I hearing. See *Good*, n 62 *supra* at 188-189. See also *Fare v Michael C*, 442 US 707; 99 S Ct 2560; 61 L Ed 2d 197 (1979); *Gallegos v Colorado*, 370 US 49; 82 S Ct 1209; 8 L Ed 2d 325 (1962); *State v Benoit*, 126 NH 6; 490 A2d 295 (1985). We do not reach the

apply to the dispositional phase of a waiver hearing. The United States Supreme Court has confined its extension of Fifth and Sixth Amendment rights to the adjudicative and not the dispositional phase of waiver proceedings. Use of defendant's alleged statements to the police and the court psychologist at the phase II dispositional hearing, therefore, did not violate any constitutional provisions.

The historical and legislative directives are clear.[64] We therefore interpret the purpose behind

issue whether statements made to psychologists or psychiatrists at court-ordered examinations are to be treated like admissions or confessions made to police officers during custodial interrogation.

[64] We disagree with the dissent's conclusion that our interpretation of the statutes and court rules does not comport with the " 'rehabilitative ideal.' " *Post,* p 227.

First, the dissent never addresses the concept of "protection of the public" as required by MCR 5.950(B)(2), nor does it reconcile its position with the historic "full investigation" required by court rule and case law.

Second, a clear purpose of the disposition hearing is to determine whether a juvenile is amenable to treatment in the juvenile justice system. If not, it is determined that the adult system is better equipped to rehabilitate; the determination is *not* to inflict a more severe punishment. In cases in which an appellate court is faced with facts that indicate a desire to punish, it is proper to search for error in the application of the waiver factors and not for error based on constitutional grounds. Moreover, there is no certainty of punishment where the juvenile is afforded the right to a jury trial. The possibility of acquittal or even probation in a criminal trial (contrasted to an indefinite term in a juvenile home, in some cases) is not properly characterized as "punishment."

Third, the authority cited in the dissent does not make the same clear distinction between the adjudicative and dispositional phases of a waiver hearing as we find in the relevant Michigan statutes and court rules. We would have to agree with the dissent's position were it the case that Michigan probate practice did not recognize rights afforded adult criminal defendants at some phase of a juvenile waiver hearing. However, these protections are recognized at the adjudicative or "probable cause" phase.

Moreover, the cases are distinguishable on their facts. For example, in *Christopher P v State,* 112 NM 416; 816 P2d 485 (1991), the juvenile was ordered to discuss the delinquent acts themselves with a psychologist, and opposing counsel was permitted to watch the examination through a one-way mirror. Its applicability in this case is therefore tenuous where the inquiry was limited to the amenability

the Probate Code and the court rules to favor individualized tailoring of a juvenile's sentence with emphasis on both the child's and society's welfare. Such individualization would be seriously curtailed if the dispositional phase was restricted as defendant urges.

The decision of the Court of Appeals is reversed and the case is remanded for consideration of defendant's other appellate issues.[65]

BRICKLEY, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

CAVANAGH, C.J. I respectfully dissent. The majority holds that "the legislative purpose and the underpinnings of the Probate Code mandate the conclusion that a probate court's discretion at the dispositional phase of a waiver hearing remains unfettered by certain evidentiary requirements recognized in criminal proceedings and already extended to the adjudicative phase of a waiver hearing." *Ante,* p 204. The decision to waive jurisdiction over a juvenile is not, however, consistent with the "rehabilitative ideal," underlying the

question without a specific order to discuss the alleged crime. In fact, the holding in *Christopher P* made clear that the authority of the children's court to order a psychological examination was not challenged. 816 P2d 486.

[65] On remand, the Court of Appeals is to consider defendant's other appellate issues, including whether the circuit court erred in affirming the decision of the probate court for failure of the prosecution to offer sufficient evidence that defendant was not amenable to treatment and rehabilitation, whether defendant was denied any constitutional right for failure of the circuit court to grant severance of his trial from that of his brother, and whether the circuit court erred for failing to instruct the jury about possession of more than 225 but less than 650 grams of a controlled substance. While we offer no opinion on the matter, defendant may also pursue the voluntariness of the alleged statements used at the trial in circuit court following the court's denial of a motion to suppress. The issue was not addressed by the Court of Appeals for its decision on the constitutionality issue.

creation of the juvenile courts.[1] As one commentator noted:

> To those committed to rehabilitation as a goal of the justice system, waiver of juvenile court jurisdiction over any offender seems nonsensical. As a matter of logic, waiver could only be appropriate when a better means of rehabilitation—that is, a better process for removing the juvenile's desire to misbehave—exists in the criminal court. As a practical matter, the criminal courts will never provide a better rehabilitative process than the juvenile court. If nothing else, the conditions of criminal incarceration guarantee that. So a waiver theory based on the concept of rehabilitation has but one premise—there should be no waiver. [Whitebread & Batey, *The role of waiver in the juvenile court: Questions of philosophy and function,* printed in Major Issues in Juvenile Justice Information and Training: Readings in Public Policy 207, 218 (1981).]

While there are no doubt instances where it is necessary to waive jurisdiction over certain juvenile offenders, the decision to waive cannot be characterized as being consistent with the philosophy underlying the juvenile court system. In reality, the decision to waive juvenile court jurisdiction is not a decision to *rehabilitate,* but, rather, a decision to *punish* the juvenile upon conviction. Thus, the juvenile should be afforded the traditional due process protections in judicial waiver proceedings enjoyed by adults accused of crime.

I

The majority holds that adult constitutional protections are unnecessary in phase II juvenile

[1] Feld, *Criminalizing juvenile justice: Rules of procedure for the juvenile court,* 69 Minn L R 141, 146-147 (1984).

waiver hearings because it is a dispositional proceeding and "*precedes* any determination of guilt." *Ante,* p 219. (Emphasis in original.) In so holding, the majority makes clear that it views phase II as a nonadversarial proceeding that is concerned only with the determination of the forum within which the juvenile will be tried. As is evident from this discussion, however, there is much more at stake in phase II of the juvenile waiver proceeding than the mere determination of which court will adjudicate the juvenile's guilt or innocence.

Since the United States Supreme Court decided *Kent v United States,* 383 US 541; 86 S Ct 1045; 16 L Ed 2d 84 (1966), and *In re Gault,* 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967), various jurisdictions have rejected the view espoused by the majority, including the United States Court of Appeals for the Fourth Circuit,[2] Alaska,[3]

---

[2] *Kemplen v Maryland,* 428 F2d 169, 174 (CA 4, 1970). In *Kemplen,* the court stated:

> [I]t seems to us nothing can be more critical to the accused than determining *whether there will be a guilt determining process in an adult-type criminal trial.* The waiver proceeding can result in dire consequences indeed for the guilty accused. If the juvenile court decides to keep jurisdiction, he can be detained only until he reaches majority. . . . But, if jurisdiction is waived to the adult court, the accused may be incarcerated for much longer, depending upon the gravity of the offense, and, if the offense be a felony, lose certain of his rights of citizenship. [Emphasis in original.]

[3] *R H v State,* 777 P2d 204, 210 (Alas App, 1989). The court stated:

> [J]uvenile waiver hearings are hardly "neutral proceedings." Rather, they are fully adversary proceedings in which the burden of establishing a child's probable unamenability to treatment is formally allocated to the state. . . .
>
> Nor can juvenile waiver proceedings realistically be said to affect "only the forum where the issue of guilt will be adjudicated." A juvenile waiver proceeding is the only available avenue by which the state may seek to prosecute a child as an adult. Consequently, the stakes involved in such proceedings are high:

Kansas,[4] Massachusetts,[5] New Mexico,[6] and Oklahoma.[7] Either by analogizing the transfer hearing to the sentencing phase of adult criminal proceedings,[8] or by characterizing the rights affected by the decision to waive jurisdiction as equally, if not more important, than the rights affected in juvenile proceedings to determine delinquency,[9] each of

---

"The result of a fitness hearing is not a final adjudication of guilt; but the certification of a juvenile offender to an adult court has been accurately characterized as 'the worst punishment the juvenile system is empowered to inflict.'" [Quoting *Ramona R v Superior Court,* 37 Cal 3d 802, 810; 210 Cal Rptr 204; 693 P2d 789 (1985).]

[4] *Edwards v State,* 227 Kan 723, 725; 608 P2d 1006 (1980) (stating that "proceedings to certify a minor to stand trial as an adult [as] 'comparable in seriousness to a criminal prosecution'").

[5] *Commonwealth v Wayne W,* 414 Mass 218, 230; 606 NE2d 1323 (1993). The court stated:

It minimizes the importance, and the potential impact, of transfer hearings to characterize them as civil proceedings that merely determine the proper forum for an adjudication of guilt. Part B hearings are *fully adversary*—the Commonwealth seeks transfer; the juvenile seeks to remain in the juvenile justice system. In a murder case, the outcome of these proceedings will, in the event of conviction, usually mean the difference between a limited period of confinement in a treatment setting and a lengthy term of imprisonment. [Emphasis added.]

[6] *Christopher P v State,* 112 NM 416, —; 816 P2d 485, 486 (1991) (stating that majority's characterization of juvenile waiver proceedings "diminishes the impact of the proceedings on the child").

[7] *JTP v State,* 544 P2d 1270, 1276 (Okla Crim App, 1975) (characterizing the nature of the rights affected by a waiver decision as "critical").

[8] See *Kemplen,* n 2 *supra; R H,* n 3 *supra;* and *Wayne W,* n 5 *supra.*

[9] See *Edwards,* n 4 *supra,* p 725 (holding that "[t]he exclusionary rules, pertaining to illegally obtained confessions, [are] equally applicable to waiver proceedings in juvenile courts, as to juvenile proceedings or criminal trials").

In *JTP,* n 7 *supra,* p 1276, the Oklahoma Court of Criminal Appeals held:

[W]e are compelled to conclude that there is no rational basis for a rule which would permit an illegally obtained confession to be introduced into evidence at a certification hearing when

these jurisdictions has held that constitutional protections afforded adult criminal defendants apply to juvenile waiver proceedings.

Those jurisdictions that view the decision to waive juvenile court jurisdiction as being analogous to adult sentencing, generally rely on *Estelle v Smith,* 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981), in finding that the privilege against compelled self-incrimination applies to juvenile waiver proceedings. In *Estelle,* the Supreme Court held that the Fifth Amendment protects against the use of testimonial disclosures that might subject a person to harsher punishment upon conviction. *Id.,* pp 462-463. The Court stated:

> The essence of this basic constitutional principle is "the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." . . .
>
> The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." [*Id.,* p 462, quoting *Gault, supra,* p 49. Emphasis in original.]

the same confession would be clearly excluded at a delinquency hearing or a criminal trial. In addition we believe it to be contrary to the fundamental policy of the juvenile court system to permit a child within its jurisdiction to stand trial as an adult with no consideration of whether an admission or confession obtained from him was taken under circumstances which make its trustworthiness suspect. We hold it is the duty of the judge of the juvenile court to deny admission into evidence at a certification hearing those statements of a child, obtained in violation of constitutional or statutory rights, which are inadmissible in delinquency or criminal proceedings.

See also *Christopher P,* n 6 *supra,* 816 P2d 487 (stating that "[c]onsidering the consequences that evolve from transfer, the distinction between adjudicatory and transfer proceedings blurs in the context of the fifth amendment").

The Court distinguished between the "limited, neutral purpose of determining his competency to stand trial," and the "plainly adverse" use of testimonial disclosures to enhance a defendant's punishment. *Id.,* p 465.

Characterizing the waiver proceeding as adversarial and the decision to waive jurisdiction as punishment, both the court in *R H v State,* 777 P2d 204, 208 (Alas App, 1989), and the court in *Commonwealth v Wayne W,* 414 Mass 218, 236; 606 NE2d 1323 (1993), held that *Estelle* "foreclosed" the use of confessions and admissions taken in violation of a juvenile's right against compelled self-incrimination in juvenile waiver proceedings. I agree.

The majority's reasoning to the contrary ignores reality. The waiver of juvenile court jurisdiction is "a *sentencing* decision that represents a choice between the punitive disposition of adult criminal court and the 'rehabilitative' disposition of the juvenile court." Feld, *Criminalizing juvenile justice: Rules of procedure for the juvenile court,* 69 Minn L R 141, 269 (1984). (Emphasis in original.)[10] Given the substantial interests at stake, there can be no question that waiver proceedings are adversarial. Indeed, this case demonstrates the adversarial nature of phase II waiver proceedings. The prosecution filed a petition for waiver of jurisdiction to the circuit court and presented evidence against the defendant, attempting to prove, as it

---

[10] The waiver decision is a choice to allocate an alleged offender to one of two courts which differ markedly in basic philosophy; in other words, the waiver decision is a choice of philosophies . . . . In aspiration, at least, the juvenile court is committed to rehabilitation of the offender, while the primary commitment of the criminal justice process lies elsewhere, in the theoretical realms of retribution and deterrence. [Whitebread & Batey, *supra,* p 213.]

must,[11] that Kafan Hana, who had no prior juve-
nile record, was "beyond rehabilitation under ex-
isting juvenile programs and statutory proce-
dures." See former MCR 5.950(B)(2)(c). Kafan pre-
sented substantial testimonial evidence, attempt-
ing to convince the court to retain jurisdiction.

There can also be no question regarding the
punitive nature of the decision to waive juvenile
jurisdiction over Kafan. Had Kafan been pros-
ecuted as a juvenile, he would have faced a maxi-
mum of two and one-half years (he was 16½) of
confinement (until 19) in a juvenile reformatory.
The decision to waive jurisdiction over Kafan,
however, paved the way for the state to secure not
only a conviction but also a life sentence in an
adult prison.[12] In my view, this case clearly demon-
strates both the adversarial and punitive nature of
juvenile waiver proceedings and compels the con-
clusion that *Estelle* requires the recognition of
Fifth Amendment protections in such proceedings.

I also agree with the courts that find the ration-
ale underlying the United States Supreme Court
decision in *Gault* to compel the conclusion that the
constitutional rights recognized in that case must
apply in phase II proceedings.[13] In my view, the
rights affected by the decision to waive jurisdiction
are equally, if not more important, than the rights
affected in juvenile proceedings to determine delin-
quency, requiring equal, if not more protection.
Further, as mentioned in part III, waiver of juve-
nile court jurisdiction deprives the juvenile of his

[11] See former MCR 5.950(B)(2)(b).

[12] Because the crime charged carried a mandatory sentence, the
decision to waive jurisdiction, for all practical purposes, established
the sentence that he would receive upon conviction.

[13] See n 9; see also *In re Doe,* 61 Hawaii 48, 58; 594 P2d 1084 (1979)
(stating that "full application of the broad principles announced in
*Gault* would lead to the conclusion that the privilege [against com-
pelled self-incrimination] should apply in such proceedings").

statutory rights to the traditional benefits of the
juvenile justice system. As recognized in both *Kent*
and *Gault,* the justification for denying juveniles
traditional due process rights is the benefits that
juveniles purportedly derive from the juvenile jus-
tice system. See part II. Therefore, it seems to
follow that traditional due process protections
should be afforded to juveniles in any proceeding
in which the state seeks to deprive a juvenile of
those rights.[14] In filing a petition for waiver of
juvenile court jurisdiction, the state is not acting
as parens patriae to determine whose "custody" is
in the best interest of the juvenile accused of
crime. To the contrary, the state is deliberately
initiating, via the only available avenue, *criminal
proceedings* against the juvenile. Accordingly, such
proceedings should be "subject to the requirements
which restrict the state when it seeks to deprive a
person of his liberty." *Gault, supra,* p 17.

II

At common law, children over the age of seven
who committed crimes were subject to punishment
as adults and entitled to the same procedural
protections. *Gault, supra,* p 16. As the majority
recognizes, however, punishment was foreign to
the philosophy underlying the progressive move-
ment that sparked the creation of juvenile courts.
*Ante,* p 210. The progressives envisioned a system
that focused "on reforming the offender rather
than on punishing the offense." Feld, *supra,* pp
146-147.

[14] If the United States Constitution requires the extension of adult
criminal protections to juveniles retained in the juvenile system,
because the underlying rationale for denying such benefits has, for
the most part, little basis in reality, then surely the Constitution
must also require the extension of such protections to juvenile waiver
proceedings where the juvenile faces the possibility of losing those
benefits entirely.

The early reformers sought to develop a juvenile justice system that would "use the techniques of the then-developing behavioral sciences—psychiatry, psychology, and sociology—to treat and cure antisocial behavior in children." Whitebread & Batey, *supra*, p 208. "The child—essentially good, as they saw it—was to be made 'to feel that he is the object of [the state's] care and solicitude,' not that he was under arrest or on trial." *Gault*, *supra*, p 15. To avoid the stigma associated with adult criminal prosecutions, "hearings were confidential and private, access to court records was limited, and youths were found to be 'delinquent' rather than guilty of an offense." Feld, *supra*, p 151. Further, a juvenile found to be delinquent was "never to be incarcerated with adult offenders . . . ." Whitebread & Batey, *supra*, p 208.

"As corollaries to these propositions, the reformers . . . proposed that the courts operate informally and without legal process."[15] *Id.* As a result, until the United States Supreme Court decided *Kent* and *Gault* "[c]hildren had none of the traditional rights of the criminal defendant because juvenile courts were considered 'civil' courts." Whitebread & Batey, *supra*, p 209. Traditional due process rights were considered unnecessary because "the state was proceeding as parens

[15] "Because the reformers' aims were benevolent, their solicitude individualized, and their intervention guided by science, [the early reformers] saw no reason to narrowly circumscribe the power of the state." Feld, *supra*, p 150. Consequently, the reformers sought a system that "maximized discretion to provide flexibility in diagnosis and treatment and focused on the child and the child's character and lifestyle rather than on the crime." *Id.* "Discretion was necessary because identifying the causes and prescribing the cures for delinquency required an individualized approach that precluded uniformity of treatment or standardization of criteria." *Id.*, p 147, n 22. "Because the important issues involved the child's background and welfare rather than the commission of a specific crime, courts dispensed with juries, lawyers, rules of evidence, and formal procedures." *Id.*, p 151.

patriae,"[16] and, consequently, the proceedings were viewed as nonadversarial. *Gault, supra,* p 16.

> The right of the state, as parens patriae, to deny to the child procedural rights available to his elders was elaborated by the assertion that a child, unlike an adult, has a right "not to liberty but to custody." . . . If the parents default in effectively performing their custodial functions—that is, if the child is "delinquent"—the state may intervene. In doing so, it does not deprive the child of any rights, because he has none. It merely provides the "custody" to which the child is entitled. On this basis, proceedings involving juveniles were described as "civil" not "criminal" and therefore not subject to the requirements which restrict the state when it seeks to deprive a person of his liberty. [*Id.,* p 17.]

In short, "[t]he traditional due process rights had, in theory, been traded for the benefits of the juvenile court philosophy." Whitebread & Batey, *supra,* p 209.

### III

The Supreme Court has recognized that the waiver of juvenile court jurisdiction "is a 'critically important' action determining vitally important statutory rights of the juvenile." *Kent, supra,* p 556. Aptly referred to as "the most important dispositional decision in the juvenile court,"[17] the decision to waive jurisdiction is, in reality, a decision to forgo any rehabilitative effort and to *punish* the juvenile as an adult upon conviction. In-

---

[16] The parens patriae doctrine drew no distinction between criminal and noncriminal youth conduct, a view that supported the Progressive position that juvenile court proceedings were civil rather than criminal in nature. [Feld, *supra,* pp 148-149.]

[17] Feld, *supra,* p 272.

deed, some courts have characterized the waiver of juvenile court jurisdiction as "the worst *punishment* the juvenile system is empowered to inflict." *Ramona R v Superior Court,* 37 Cal 3d 802, 810; 210 Cal Rptr 204; 693 P2d 789 (1985).[18] (Emphasis added.)

In addition to the possibility of a substantial increase in the loss of liberty upon conviction in adult court, the waiver decision also deprives the juvenile of the protections purportedly afforded juveniles under the Probate Code. For instance, incarceration with adults pending trial and, if convicted of a felony, loss of certain rights of citizenship. All of these are benefits that the early reformers relied upon to justify denying the juvenile traditional due process protections. See part II.

As the majority notes, the United States Supreme Court, although faced with the issue in *Kent,*[19] has never explicitly held that, in a juvenile waiver proceeding, a juvenile is entitled to the full panoply of constitutional protections afforded adults accused of crime. The Court did, however, find the denial of such protections particularly

---

[18] One commentator has even analogized the waiver decision to the imposition of the death penalty in adult court:

> To transfer a young offender from juvenile to criminal court is clearly not the same thing as executing a convicted murderer. However, considering waiver of serious juvenile offenders as "the capital punishment of juvenile justice" reveals a number of disturbing similarities. Capital punishment in criminal justice and waiver in juvenile justice share four related characteristics: (1) low incidence, (2) prosecutorial and judicial discretion, (3) ultimacy, and (4) inconsistency with the premises that underlie the system's other interventions. [Zimring, *Notes toward a jurisprudence of waiver,* printed in Major Issues in Juvenile Justice Information and Training: Readings in Public Policy, p 193.]

[19] The Court was not required to reach this issue because it remanded the case because of procedural error with respect to waiver of jurisdiction. *Kent, supra,* p 552.

disturbing, "where . . . there is an absence of any
indication that the denial of rights available to
adults was offset, mitigated or explained by action
of the Government, as parens patriae, evidencing
the special solicitude for juveniles commanded by
the Juvenile Court Act." *Kent, supra,* pp 551-552.
It was precisely this concern—that "children had
traded away their traditional due process rights
for benefits they were not receiving," Whitebread
& Batey, *supra,* p 209—that prompted the Court in
*Gault* to hold that in proceedings involving the
potential loss of liberty, children are entitled to
constitutionally adequate notice of the charges
against them, *Gault, supra,* p 41, the right to
counsel, *id.,* the right to confrontation and cross-
examination, *id.,* pp 56-57, and the Fifth Amend-
ment right against compelled self-incrimination.
*Id.,* pp 47-48.

IV

For the foregoing reasons, I would remand this
case to the juvenile court for a hearing to deter-
mine whether the statements and confessions in-
troduced and considered at phase II of Kafan's
juvenile waiver hearing were obtained in violation
of his Fifth Amendment right to remain silent or
his Sixth Amendment right to counsel. If the
juvenile court determines that the statements and
confessions were constitutionally obtained, then I
would affirm Kafan's adult convictions and sen-
tences. If, however, the juvenile court determines
that the statements and confessions were obtained
in violation of Kafan's constitutional rights, then
the juvenile court should conduct another waiver
hearing. In the event another waiver hearing is
necessary, and, absent any tainted statements and
confessions, the juvenile court again determines

that the waiver of juvenile court jurisdiction is appropriate, then I would affirm Kafan's adult convictions and sentences. If, absent any tainted statements and confessions, however, the juvenile court determines that the waiver of juvenile court jurisdiction was inappropriate, then I would vacate Kafan's adult convictions and sentences, try Kafan as a juvenile, and enter the appropriate dispositional order consistent with the Probate Code.

LEVIN, J., concurred with CAVANAGH, C.J.